[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15406

_____

Agency No. 19668-06

WILLIAM E. GUSTASHAW, JR.,
NANCY D. GUSTASHAW,

Petitioners-Appellants,

versus

COMMISSIONER OF IRS,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court

_____

(September 28, 2012)

Before HULL, MARCUS and HILL, Circuit Judges.

HULL, Circuit Judge:

Although a tax shelter can be legitimate, Petitioner William Gustashaw, Jr.,[1] participated in one that was not. Gustashaw claimed substantial tax benefits from the shelter on four consecutive tax returns. The IRS later disallowed Gustashaw's claim and determined deficiencies in tax and accuracy-related penalties, including gross valuation misstatement penalties and a negligence penalty. Gustashaw conceded the deficiencies in tax, but contested the penalties. The Tax Court affirmed the IRS's imposition of the penalties. After review and oral argument, we affirm.

## I. BACKGROUND

### A. Gustashaw's Education and Business Background

Petitioner Gustashaw is a college-educated, successful businessman. Gustashaw, who married his wife Nancy in college, graduated from Gannon University in 1973 with a bachelor of science degree in industrial management. While in college, Gustashaw took business-related courses, including managerial cost accounting and the principles of accounting.

Following graduation, Gustashaw embarked on a nearly thirty-year business

---

[1]For purposes of this appeal, we refer to William Gustashaw, Jr., alone as "petitioner." His wife Nancy Gustashaw is a party solely because the Gustashaws filed joint returns, but Nancy Gustashaw relied on her husband to prepare their taxes and took no part in the investigation and reporting of the transactions at issue.

career.  From 1973 to 1993, Gustashaw held management positions with various companies in the food and beverage industry.  Then, in 1994, Gustashaw became vice-president of operations at Merck Medco Managed Care ("Merck Medco") in Tampa, Florida.  As vice-president of operations, Gustashaw was responsible for large-scale prescription processing in a mail-order pharmacy.  Subsequently, Merck Medco promoted Gustashaw to vice-president and general manager, which expanded his responsibilities to all operations of two mail-order pharmacies. Merck Medco also provided Gustashaw with generous stock options.

## B.    Gustashaw's Early Retirement Plan

In 1995, Gustashaw, who was then 45 years old, began planning for an early retirement.  Gustashaw had a conservative investment history and handled nearly all of his and his wife's investment decisions himself.  In addition, Gustashaw had filed all of the couple's joint federal income tax returns.  However, to assist with his retirement plan, Gustashaw decided to hire a financial planner.

To that end, Gustashaw hired Ralph Maulorico, a financial planner at New England Financial who represented wealthy individuals.  Gustashaw wanted to exercise his Merck Medco stock options by 2000, and sought Maulorico's advice on whether the stock option exercise would generate enough income to fund the Gustashaws' retirement.  Maulorico recommended the stock option exercise.

Thus, in 1996, Gustashaw sold some of the acquired stock and invested the proceeds in mutual funds.

The next year, 1997, Gustashaw decided to hire a tax accountant to review the Gustashaws' tax returns, which Gustashaw would continue to prepare until 2000. On Maulorico's recommendation, Gustashaw hired William Gable, Maulorico's college friend. Gable, who owns an accounting practice in Florida, is an enrolled agent and accountant, but not a certified public accountant. Gable received both an undergraduate and a master's degree in accounting, with the master's degree specializing in taxation, at LaCrosse University. Gable reviewed the Gustashaws' self-prepared joint returns for 1997 through 1999, before they were filed.

In 1999, Merck Medco underwent a reorganization and offered Gustashaw an option to retire early. Gustashaw accepted and retired that same year. The following year, 2000, Gustashaw exercised his remaining Merck Medco stock options and sold the stock, generating $8,077,376 in income. For that year, Gable prepared the tax return, at Gustashaw's request. The 2000 return claimed tax benefits through a complicated financial transaction known as "CARDS," as explained in the next section.

## C.    The CARDS Tax Shelter

4

In early 2000, Maulorico learned from a colleague about the Custom Adjustable Rate Debt Structure ("CARDS") transaction and its use as a tax shelter. The colleague learned of the CARDS transaction through Roy Hahn, a certified public accountant and founder of Chenery Associates, Inc. ("Chenery"). Chenery developed and promoted the CARDS shelter. At the time, Maulorico, who had experience in tax shelters, believed the transaction offered both profit potential and a tax shelter for the income from Gustashaw's stock option exercise. Thus, Maulorico suggested the CARDS transaction to Gustashaw, who became interested in it.

During the 1990s and early 2000s, the CARDS transaction was promoted to high net worth individuals both as an investment-financing mechanism and a tax shelter. In the CARDS transaction, a U.S. taxpayer, facilitated by a newly created company, uses a bank loan to create a tax loss based on an artificially high basis (or cost) in assets, which then allows the taxpayer to generate a tax benefit by offsetting real, taxable income.

There are three steps to create the CARDS tax shelter.[2] First, in the loan origination step, a foreign bank loans currency to the borrower, a Delaware limited

---

[2]For a fuller discussion of the CARDS transaction, see Kerman v. Comm'r, 2011 WL 839768 (T.C. 2011), appeal pending, No. 11-1822 (6th Cir.).

5

liability company owned 100% by nonresident alien individuals. Importantly, the foreign ownership of the borrower ensures the borrower is not subject to U.S. taxation. The loan is for a 30-year term with annual interest payments due, but not principal payments. The bank deposits the loan proceeds directly into the borrower's account at the bank. However, to use the loan proceeds, the borrower must meet collateralization requirements by acquiring valuable, stable assets such as government bonds.

Second, in the loan assumption step, a U.S. taxpayer and the borrower enter into an agreement whereby the U.S. taxpayer assumes joint and several liability for the borrower's entire loan. In exchange, the U.S. taxpayer receives only a small percentage of the loan proceeds from the borrower, e.g., 15% for our purposes. The borrower agrees to retain all interest obligations, and the U.S. taxpayer agrees to repay the unpaid principal amount. The U.S. taxpayer then could, in theory, use the assumed loan proceeds to make an investment, but the bank maintains discretion on whether to release any funds. To access the loan proceeds, the U.S. taxpayer must deposit equivalent, substitute collateral with the bank.

And third, in the currency exchange step, the U.S. taxpayer exchanges his 15% portion of the foreign-currency loan for U.S. dollars. This currency exchange is a taxable event generating tax benefits. To achieve the benefits, the U.S.

6

taxpayer claims that his basis in the exchanged currency is the entire amount of the loan, not the 15% of the loan that the taxpayer actually received from the tax-exempt borrower. This discrepancy creates a permanent tax loss of 85% of the original loan amount, which permits the U.S. taxpayer to shelter other unrelated, taxable income.

In August 2000, the Internal Revenue Service ("IRS") issued a notice warning taxpayers against claiming tax benefits through tax shelters similar to the CARDS shelter, because such benefits would be subject to penalties. See I.R.S. Notice 2000-44, 2000-2 C.B. 255. In March 2002, the IRS issued another, similar notice that was targeted specifically at the CARDS shelter. See I.R.S. Notice 2002-21, 2002-1 C.B. 730. The 2002 notice also advised taxpayers who had used the shelter to file amended returns. Id. Then, in 2005, the IRS offered a settlement initiative whereby taxpayers could pay a reduced penalty by conceding the claimed tax benefits. See I.R.S. Announcement 2005-80, 2005-2 C.B. 967.

## D.    Gustashaw's Investigation of the CARDS Transaction

After Maulorico suggested the CARDS transaction, Gustashaw began to investigate it. Maulorico arranged for Gustashaw to speak with Hahn, and most of Gustashaw's understanding of the transaction was from oral discussions with Maulorico, Gable, and Hahn. According to Gustashaw, the CARDS shelter

7

appeared attractive because it provided both tax advantages and investment opportunities.  These opportunities included (1) elimination of his year 2000 tax liability by creating a tax loss, (2) access to investment funds over 30 years, and (3) leverage of the euro against the dollar by drawing down a euro-denominated loan and repaying it in dollars.

Over several months, Gustashaw, Maulorico, and Gable had multiple conversations about the CARDS transaction with Hahn, the transaction's promoter.  Hahn explained how the CARDS transaction worked, including that the transaction would generate a permanent tax loss of approximately 85% of the original loan amount.  Chenery, Hahn's firm, would set up the transaction, and Hahn stated that Gustashaw's only out-of-pocket expense would be Chenery's investment banking fee.

In June 2000, Gustashaw met with Maulorico and Gable to discuss both the CARDS transaction and an executive summary about CARDS that Hahn had prepared.  After the meeting, Maulorico opined that Gustashaw could make a 16% return on his investment in the CARDS transaction, based on Maulorico's "anecdotal[]" review of the transaction's economics and past Standard & Poor's compound annual returns.  Maulorico did not provide a written analysis. Ultimately, Gustashaw and Maulorico concluded that Gustashaw would benefit

from the CARDS transaction and the tax benefits it would generate for his 2000 tax return.

Gable, however, refused to prepare Gustashaw's 2000 tax return without a tax opinion letter affirming the legitimacy of the CARDS transaction and the resultant permanent tax loss. Gable was unfamiliar with the Internal Revenue Code ("Code") provisions implicated by the transaction and was reluctant to opine on the transaction's tax ramifications. Accordingly, Gable asked Hahn, the promoter of the CARDS transaction, to obtain a tax opinion letter on the transaction's federal income tax consequences.

Hahn offered to provide a model opinion letter prepared by the law firm of Brown & Wood LLP. When Chenery, Hahn's firm, began developing the CARDS transaction in 1999, it retained Brown & Wood to write a model opinion letter on the transaction's tax consequences. Brown & Wood then maintained and updated this model opinion letter, which it either sent directly to persons interested in the CARDS transaction or permitted Chenery to distribute it. Hahn also knew that Brown & Wood "stood available" to write individual, formal tax opinion letters for CARDS participants.

Gable relayed Hahn's offer to Gustashaw and explained that because the model opinion letter was written by a major and reputable law firm, it would more

9

likely than not protect Gustashaw from substantial tax penalties if the IRS ultimately disregarded the CARDS transaction for federal tax purposes. Gustashaw asked to see the model opinion letter.

The model opinion letter explained that the CARDS transaction was a tax shelter and that the CARDS transaction "has not been before a court of law addressing the issues addressed herein."  Nonetheless, the letter concluded that, based on authority in analogous contexts, a taxpayer, "more likely than not," could claim the permanent tax loss promised by Chenery. The letter further opined that: (1) the transaction—the transfer of the euro-denominated deposit proceeds to the U.S. taxpayer in exchange for his assumption of the borrower's obligations to the bank—would constitute a sale of the foreign currency by the borrower to the taxpayer; (2) the taxpayer's tax basis in the foreign currency would equal the principal amount of the loan, plus the amount of cash and the fair market value of other consideration paid by the taxpayer to the borrower; (3) any gain or loss resulting from the foreign currency's disposition would be characterized as ordinary income or loss under I.R.C. § 988; and (4) the taxpayer would recognize no income upon the borrower's payment of the loan to the bank.

Gustashaw met with Maulorico and Gable to review the model opinion letter's conclusions.  Although Chenery, the CARDS transaction's promoter, had

retained and paid Brown & Wood to provide the model opinion letter, Gable viewed the letter as an "honest opinion of the viability of [the CARDS] transaction" because Brown & Wood was a major, reputable law firm. Gable then insisted Gustashaw obtain a formal tax opinion letter from Brown & Wood. However, Gable did not recommend obtaining an opinion from a different attorney or law firm, as he believed it was an unnecessary expense. Gustashaw, relying partly on Gable's assurance that Brown & Wood had expertise in foreign transactions, had Chenery obtain an opinion letter only from Brown & Wood. Chenery paid for the formal opinion letter out of its fee agreement with Gustashaw, but Gustashaw did not know how much Chenery paid. Gustashaw never had any individualized discussions or conversations with anyone at Brown & Wood.

In July 2000, Gustashaw asked Gable to determine his estimated year 2000 tax liability and to make projections about his potential tax savings as a result of the CARDS shelter. To make the report, completed in August 2000, Gable relied on information provided by Hahn, the CARDS transaction's promoter. Gable's report included projections on the necessary CARDS investment schedule needed to create a loss sufficient to offset Gustashaw's 1998, 1999, and 2000 tax liabilities, and projections for the potential costs of the transaction, using

11

reasonable rates of return if the IRS disallowed the generated deductions.  The report assumed that the CARDS transaction would terminate, prompting the loan's repayment, on April 30, 2004.  That date was chosen because it was outside the period of limitations of assessing additional tax for the 2000 tax return.

Following the conclusion of his investigation, Gustashaw decided to enter into a CARDS transaction.  Gustashaw never investigated whether he could obtain a similar credit arrangement from other sources.  Gustashaw also did not seek a ruling from the IRS on the CARDS transaction's tax consequences, or any independent opinion regarding the transaction's legality.  Rather, according to Gustashaw, he believed Maulorico's and Gable's assurances about the transaction's legitimacy, even though Gable and Maulorico themselves relied on Hahn's representations about the transaction.  Gable and Maulorico were impressed that a major law firm and a major bank would be involved, thinking neither would engage in illegitimate transactions.

## E.    The CARDS Transaction for Gustashaw

Hahn and Chenery agreed to arrange the CARDS transaction for Gustashaw for an $800,000 fee.  Gustashaw paid Chenery $10,000 up front, with the balance to be paid upon the loan's termination.

The CARDS transaction for Gustashaw worked as follows.  Bayerische

12

Hypo- und Vereinsbank AG ("HVB"), a large German bank, served as the lender. A newly formed Delaware L.L.C., Osterley Financial Trading L.L.C. ("Osterley"), served as the borrower. Osterley was wholly owned by two nonresident alien individuals.

On December 5, 2000, the bank HVB entered into an agreement with Osterley to lend €12,900,000 to Osterley for a 30-year term with interest payments (but not principal payments) due annually. HVB deposited the loan proceeds directly into Osterley's account at HVB, with 85% invested in government bonds, and 15% on short-term deposit. All of these funds served as collateral for the loan, and no funds ever left the bank. To withdraw the loan proceeds, Osterley was required to deposit substitute collateral.

Next, the bank HVB sent Gustashaw a letter, dated December 21, 2000, confirming his interest in assuming joint and several liability for the euro-denominated loan to Osterley. The letter stated that HVB made no guarantee or representation about any aspect of the CARDS transaction, including its tax ramifications. Further, the letter stated that Gustashaw represented that his own, independent legal counsel had advised him and that he would comply with U.S. tax laws.

On December 21, 2000, Gustashaw executed the documents to participate in

13

the CARDS transaction.  Gustashaw read the documents before signing them, but he admitted that he did not fully understand them.  Gustashaw assumed most of the language was boilerplate and formalized his discussions with Hahn.  Thus, Gustashaw did not have Gable, Maulorico, or an attorney review the CARDS transaction documents.

The CARDS transaction documents executed by Gustashaw provided that Osterley agreed to transfer 15% of the loan proceeds on short-term deposit to Gustashaw.  In exchange, Gustashaw agreed to assume joint and several liability for Osterley's obligations to the bank HVB, including repayment of the entire loan.  Osterley and Gustashaw also agreed that, as between them, Gustashaw would repay the unpaid principal amount of the loan at maturity and Osterley would retain all interest obligations.  There was no provision for a euro-dollar conversion opportunity in the first year.

After Gustashaw executed the agreement, the bank HVB transferred the 15% portion of the loan to an HVB account in Gustashaw's name and converted it to dollars.  HVB maintained discretion on whether Gustashaw could access those funds.  If Gustashaw desired to access the funds, HVB required him to deposit substitute collateral with the bank that was at least equivalent to the amount of funds withdrawn.  In other words, the entire amount of the loan would remain

14

fully collateralized at all times. At each annual interest date, HVB at its discretion could permit Gustashaw to purchase more of the loan proceeds, up to the full principal amount of the loan, by his providing additional collateral. HVB had discretion to call the loan.

Sometime after Gustashaw executed the agreement, he received Brown & Wood's formal tax opinion letter, dated December 31, 2000. This letter set out the details of Gustashaw's CARDS transaction, including the roles played by Chenery, HVB, and Osterley, as well as the amount borrowed. The tax analysis contained in the letter, however, was identical to that contained in the Brown & Wood model opinion letter that Chenery used to promote the CARDS transaction, and was not particularized to Gustashaw's CARDS transaction. Accordingly, Gustashaw's letter from Brown & Wood reached the same "more likely than not" conclusions as the firm's model opinion letter. Gable also reviewed the letter and read the cited Code sections, but performed no independent analysis. Gable assumed the letter was correct.

**F.    The Termination of the CARDS Transaction**

Gustashaw did not attempt to access the funds for several months. Then, on April 2, 2001, he pledged substitute collateral with a value of $2,550,850. The bank HVB wired $1,008,465 to Gustashaw's HVB account, and $735,000 to

15

Chenery for fees associated with the CARDS transaction.

On November 13, 2001, HVB issued a mandatory prepayment election notice to Gustashaw. The notice stated that the entire outstanding principal amount of the loan, including any interest accrued, would be due and payable as of December 5, 2001. Maulorico asked Chenery's Hahn whether another bank would provide the same credit arrangement, but all other banks declined. On December 17, 2001, Gustashaw's CARDS transaction terminated, with all debts satisfied.

## G.    Gustashaw's Tax Returns and the Notice of Deficiency

On his 2000 tax return, Gustashaw reported the CARDS transaction as a foreign currency transaction, pursuant to I.R.C. § 988. The return stated that Gustashaw had acquired property in a foreign currency transaction with an alleged basis of $11,739,258 on December 5, 2000, and sold it on December 21, 2000, at an alleged sales price of $1,800,934. That generated an ordinary loss of $9,938,324. Gable, who prepared Gustashaw's 2000 return, relied on Hahn to calculate the amounts reported.

The claimed ordinary loss offset all of Gustashaw's reported income for 2000, resulting in $1,784,462 of negative adjusted gross income. Gustashaw then claimed net operating loss carryforward deductions related to the CARDS transaction of $1,231,106, $785,986, and $498,860 on his 2001, 2002, and 2003

16

returns, respectively.

On June 29, 2006, the IRS issued a notice of deficiency to Gustashaw, assessing deficiencies in tax and accuracy-related penalties under I.R.C. § 6662(a) for his 2000, 2001, 2002, and 2003 tax returns. The IRS assessed a 40% gross valuation misstatement penalty for 2000 through 2002, and a 20% negligence penalty for 2003. Specifically, the penalties were: $1,275,290 for 2000; $63,910 for 2001; $34,260 for 2002; and $898 for 2003.[3]

The IRS disallowed the $9,938,324 loss claimed on the 2000 tax return on the ground that, inter alia, Gustashaw failed to establish the claimed $11,739,258 basis and that the CARDS transaction lacked economic substance. Further, the IRS stated that the transaction "was entered into for the primary purpose of tax avoidance, and/or was prearranged and predetermined." The IRS also disallowed the 2001, 2002, and 2003 claimed net operating loss carryforward deductions because of the adjustments to the 2000 tax return.

## H.    HVB's Admission of Fraudulent Behavior

On February 13, 2006, the bank HVB entered into a deferred prosecution

---

[3]In the original notice of deficiency, the IRS assessed 20% negligence penalties against Gustashaw for the years 2001 and 2002, in the amounts of $31,955 and $17,130, respectively. After proceedings commenced in the Tax Court, the IRS filed an "Amendment to Answer to Amended Petition" in which it asserted that Gustashaw was liable for 40% gross valuation misstatement penalties for both years, rather than just the 20% negligence penalties. The increased 40% penalty amounts were $63,910 for 2001 and $34,260 for 2002.

17

agreement with the United States in which it admitted that it participated in several tax shelter transactions, including CARDS, between 1996 and 2002. HVB admitted that loans entered in connection with the CARDS shelter purported to involve 30-year loans, when all parties, including the borrowers, knew that the transactions would be unwound in approximately one year so as to generate false tax benefits for the participants. HVB acknowledged that the transactions had no purpose other than to generate tax benefits for the participants. HVB further admitted that it engaged in activities with others, including Brown & Wood, "related to the CARDS tax shelter with the intention of defrauding the United States."

## I.    Tax Court Trial and Opinion

In light of HVB's admissions of fraudulent behavior, Gustashaw conceded the deficiencies in income tax for all four years in issue. Gustashaw challenged only the penalties in the Tax Court. The case proceeded to trial in the Tax Court.

At trial, Gustashaw admitted that he did not suffer a $9,938,324 economic loss associated with the $9,938,324 tax loss claimed on the 2000 tax return. Gustashaw continued to contend that he was not liable for the penalties, in part because he had "reasonable cause," pursuant to I.R.C. § 6664, to believe the CARDS transaction was legitimate. Gustashaw also argued that because the IRS

disregarded the transaction on economic-substance grounds, the valuation

misstatement penalty should not apply as a matter of law, pursuant to a minority

rule interpretation of I.R.C. § 6662.

After a trial, the Tax Court upheld the 40% gross valuation misstatement

penalties for 2000 through 2002 and the 20% negligence penalty for 2003.  The

Tax Court applied the majority rule interpretation of I.R.C. § 6662 and rejected

Gustashaw's reasonable-cause defense.

1.    Valuation Misstatement Penalties

The Tax Court first addressed the valuation misstatement penalties.

It explained that I.R.C. § 6662(a) and (b)(3) impose a penalty of 20% of the

portion of the underpayment of tax that is attributable to a substantial valuation

misstatement.[4]  Such a misstatement exists if the taxpayer claims that the value or

adjusted basis of any property is 200% or more of the amount determined to be the

correct amount of such valuation or adjusted basis.  I.R.C. § 6662(e)(1)(A).  If the

misstatement is 400% or more of the correct amount, a gross valuation

misstatement exists and the penalty increases to 40%.  Id. § 6662(h).  The Tax

---

[4]As indicated by the Tax Court, "[u]nless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue."  Likewise, in their briefs the parties refer and cite to the version of the Code that was in effect during the relevant years.  Accordingly, unless otherwise stated, we do the same herein.

Court explained that Treasury Regulation § 1.6662-5(g) provides that the "value or adjusted basis claimed on a return of any property with a correct value or adjusted basis of zero is considered to be 400 percent or more of the correct amount."

The Tax Court found that Gustashaw was liable for the 40% gross valuation misstatement penalty for 2000 through 2002, concluding that his underpayments in tax for those years resulted from his claiming a basis in foreign currency on his 2000 return of $11,739,258, rather than a basis of zero, which is the correct amount when a transaction lacks economic substance.  In the notice of deficiency, the Commissioner determined that the correct basis for the asset was zero, and the Tax Court found that Gustashaw "effectively accepted" that determination "as accurate in conceding all of the deficiencies in tax."  It further noted that a line of cases from the Fifth and Ninth Circuits supported Gustashaw's argument that a valuation misstatement penalty is not applicable when the entire transaction is disregarded on lack-of-economic-substance grounds, but pointed out that those cases represented the minority rule and declined to follow them.  Because the proper basis was zero, the Tax Court concluded that the basis claimed on Gustashaw's 2000 return exceeded the correct basis by 400% or more.  Additionally, because that grossly inflated basis gave rise to losses that Gustashaw

20

carried forward to his 2001 and 2002 years, the Tax Court concluded that the underpayments in tax for those years were also attributable to a gross valuation misstatement.

2.    Negligence Penalty

For 2003, in which Gustashaw's carryover loss was too small for a gross valuation misstatement penalty to apply, the Tax Court upheld the 20% negligence penalty. It reasoned that "[n]egligence is strongly indicated where '[a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be "too good to be true."'" The Tax Court explained that a return position is not negligent if it is reasonably based on certain enumerated authorities, but that conclusions reached in opinion letters written by tax professionals are not considered authority. The Tax Court further explained that a reasonable and ordinarily prudent person would have considered carryforward deductions from the CARDS transaction "too good to be true" when he did not suffer an associated economic loss and invested only $800,000 in the transaction. As such, he would have conducted a thorough investigation before claiming the deduction on his tax return. The Tax Court found that Gustashaw, despite his education and experience, did not attempt to understand the mechanics of the

21

CARDS transaction, executed transaction documents without an attorney's review, and, although aware of the transaction's untested tax ramifications, declined to seek a ruling from the IRS. The Tax Court concluded that, presented with such a "too good to be true" situation, Gustashaw was negligent in failing to more closely scrutinize the CARDS transaction.

3.    The Reasonable Cause and Good Faith Defense

The Tax Court further concluded that Gustashaw had failed to show that there was reasonable cause for his underpayment or that he acted in good faith, as required for him to avoid penalties under I.R.C. § 6664(c). It rejected Gustashaw's arguments that he reasonably relied on Gable or Maulorico because neither actually opined on the tax issues involved. It concluded that the only tax advice Gustashaw sought concerning the CARDS transaction was from Brown & Wood, as neither Gable nor Maulorico proffered an opinion on the tax issues involved, and Gustashaw's reliance on Brown & Wood's advice was unreasonable because he should have known about the firm's inherent conflict of interest. The Tax Court noted that Chenery referred Gustashaw to Brown & Wood and supplied him with the firm's model opinion letter, which described a CARDS transaction that was not unique to Gustashaw's situation. Gustashaw also proffered no evidence that he had an engagement letter with Brown & Wood, spoke to any

22

attorney at the firm, or compensated Brown & Wood for either opinion letter.  On these facts, the Tax Court held that Gustashaw could not have reasonably believed that Brown & Wood was an independent adviser.

Based on this decision, the Tax Court entered a judgment in favor of the Commissioner, upholding the penalties for the years 2000 through 2003 imposed against Gustashaw under § 6662.  Gustashaw now appeals.

## II.  STANDARD OF REVIEW

We review the Tax Court's legal conclusions de novo, and its factual findings for clear error.  See Campbell v. Comm'r, 658 F.3d 1255, 1258 (11th Cir. 2011).  Whether a taxpayer acted with reasonable cause and in good faith with regard to an underpayment of tax is a question of fact that we review for clear error.  Id.

## III.  DISCUSSION

### A.    Gross Valuation Misstatement Penalty in I.R.C. § 6662

Gustashaw argues that the Tax Court erred in upholding the IRS's imposition of the 40% gross valuation misstatement penalties for 2000 through 2002.  See I.R.C. § 6662(a)–(h).  Specifically, Gustashaw contends that because the CARDS transaction lacked economic substance, there was no value or basis to misstate as to trigger the valuation misstatement penalties, and the penalties

23

should not apply as a matter of law.  Gustashaw also argues that Congress has penalized lack-of-economic-substance transactions by enacting I.R.C. §§ 6662A and 6663, and therefore, he should not be subject to gross valuation misstatement penalties under § 6662.[5]

The Internal Revenue Code establishes penalties for underpayment of tax. Section 6662(a) of the Code imposes an accuracy-related penalty of 20% of the portion of an underpayment of tax "attributable to," inter alia, negligence, any substantial understatement of income tax, or any substantial valuation misstatement.  I.R.C. § 6662(a), (b)(1)–(3).  Under the applicable regulations, only one penalty may apply to a particular underpayment of tax, even if the IRS determines accuracy-related penalties on multiple grounds.  Treas. Reg. § 1.6662-2(c).

The 20% penalty increases to 40% if there is a gross valuation misstatement. I.R.C. § 6662(h)(1).  A gross valuation misstatement exists if "the value of any

---

[5]Gustashaw additionally argues that his general concession of his underpayment of tax immunizes him from the imposition of gross valuation misstatement penalties.  He argues that when the IRS disallows a transaction on several alternative bases, not all of which involve a valuation misstatement, and the taxpayer makes a general concession of underpayment, the underpayment is not "attributable to" a gross valuation misstatement within the meaning of I.R.C. § 6662.  Gustashaw did not raise this argument before the Tax Court, and we therefore decline to consider it for the first time on appeal.  Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004).  Even if we were to consider this argument, it is substantially intertwined with and relies on a minority line of cases whose reasoning we reject infra.

24

property (or the adjusted basis of any property) claimed on any return of tax . . . is [400] percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." I.R.C. § 6662(e)(1)(A), (h)(2)(A)(i).  By contrast, a "substantial valuation misstatement," which receives only the 20% penalty, occurs when the "value of any property (or the adjusted basis of any property) claimed on any return of tax . . . is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Id. § 6662(e)(1)(A).  Treasury Regulations further provide that a gross valuation misstatement exists when the correct or adjusted basis of property is zero.  Treas. Reg. § 1.6662-5(g).  However, unless the portion of the underpayment attributable to the valuation misstatement exceeds $5,000, no substantial valuation misstatement penalty may be imposed.  I.R.C. § 6662(e)(2).

The Internal Revenue Code provides a narrow exception to the imposition of accuracy-related penalties for an underpayment if the taxpayer shows that he acted with reasonable cause and in good faith.  I.R.C. § 6664(c)(1).  This exception is detailed in section E, below.

**B.    Majority Rule: The Penalty Applies When the Deduction is Totally Disallowed for Lack of Economic Substance**

There is no question that the CARDS transaction lacked economic

25

substance.  Indeed, Gustashaw admitted as much at trial, and concedes this on appeal.  The correct basis of the foreign currency, then, was not $11,739,258, as Gustashaw reported on his 2000 tax return, but zero.  This reduction of basis to zero in turn eliminated the $9,938,324 loss that Gustashaw had claimed on his 2000 return.  With the loss eliminated, the IRS properly determined Gustashaw's underpayments in tax, and Gustashaw conceded the deficiencies.

The question we now confront, for the first time in this Circuit, is whether Gustashaw is liable for the assessed gross valuation misstatement penalties when the IRS disregarded the CARDS transaction in its entirety because it lacked economic substance.  It seems the obvious and sensible conclusion is that Gustashaw's tax underpayments were "attributable to" a gross valuation misstatement within the meaning of § 6662.  That is, the underpayments resulted from Gustashaw's reporting an artificially inflated basis in currency, which was not $11,739,258, but zero.  And, pursuant to the regulations, the basis claimed by Gustashaw ($11,739,258) was 400% more than the correct basis of the property (zero), making Gustashaw liable for the 40% gross valuation misstatement penalty.  See Treas. Reg. § 1.6662-5(g).

The statute speaks in mandatory terms—the valuation misstatement penalty "shall be added" "to any portion of an underpayment of tax required to be shown

26

on a return . . . which is attributable to . . . [a]ny substantial valuation misstatement" or "gross valuation misstatement."  I.R.C. § 6662(a), (b)(3), (h)(1). We can discern no exception for when the valuation or basis misstatements are so egregious that the entire tax benefit is disallowed, and no suggestion that the penalty should not apply when the correct basis or value is determined to be zero because the transaction is completely lacking in economic substance.

Our interpretation is in accord with the majority of circuits to have considered the question.  See, e.g., Alpha I, L.P., ex rel. Sands v. United States, 682 F.3d 1009, 1026–31 (Fed. Cir. 2012); Fidelity Int'l Currency Advisor A Fund, LLC, ex rel. Tax Matters Partner v. United States, 661 F.3d 667, 671–75 (1st Cir. 2011); Merino v. Comm'r, 196 F.3d 147, 155, 157–59 (3d Cir. 1999); Zfass v. Comm'r, 118 F.3d 184, 190–91 (4th Cir. 1997); Illes v. Comm'r, 982 F.2d 163, 167 (6th Cir. 1992); Gilman v. Comm'r, 933 F.2d 143, 149, 151 (2d Cir. 1991); Massengill v. Comm'r, 876 F.2d 616, 619–20 (8th Cir. 1989).  Only two circuits, the Fifth and the Ninth, have gone the other way.  See Gainer v. Comm'r, 893 F.2d 225 (9th Cir. 1990); Todd v. Comm'r, 862 F.2d 540 (5th Cir. 1988).  Notably, both circuits have since questioned the soundness of their interpretation.  See Bemont Invs., L.L.C. ex rel. Tax Matters Partner v. United States, 679 F.3d 339, 351 (5th Cir. 2012) (panel specially concurring); Keller v. Comm'r, 556 F.3d

27

1056, 1061 (9th Cir. 2009).

Here, we find the majority rule to be the better interpretation and will apply it in this case. That rule holds that the penalty applies even if the deduction is totally disallowed because the underlying transaction, which is intertwined with the overvaluation misstatement, lacked economic substance. See, e.g., Fidelity, 661 F.3d at 673–74. This rule rests upon the fact that the abusive tax shelter is built upon the basis misstatement, and the transaction's lack of economic substance is directly attributable to that misstatement. As Judge Boudin stated in Fidelity, that "alternative grounds with lower or no penalties existed for disallowing the same claimed losses hardly detracts from the need to penalize and discourage the gross value misstatements." Id. at 673.

## C.    Minority Rule

As for the minority rule, we think it important to note that the Fifth and the Ninth Circuits have questioned the wisdom of their positions. The Fifth Circuit has stated that, under its rule,

> by crafting a more extreme scheme and generating a deduction that is improper not only due to a basis misstatement, but also for some other reason (e.g., a lack of economic substance), the taxpayer increases his chance of avoiding the valuation-misstatement penalty—because, per the Todd/Heasley hierarchy whereby the overvaluation penalty is subordinated to any other proper adjustment, disallowing the deduction on the other ground could block the penalty. Amplifying the

28

egregiousness of the scheme—to the point where the transaction is an utter sham—could thus, perversely, shield the taxpayer from liability for overvaluation. . . . By creating this perverse incentive structure, the Todd/Heasley rule frustrates the purpose of the valuation-misstatement penalty, which is to deter taxpayers from inflating values and bases to generate large, improper tax benefits. . . .

Bemont, 679 F.3d at 355 (panel specially concurring) (citing Heasley v. Comm'r, 902 F.2d 380, 383 (5th Cir. 1990); Todd, 862 F.2d at 542–45). The Ninth Circuit also has recognized that its decision in Gainer, which rested in large part on the Fifth Circuit's reasoning in Todd, leads to the same anomalous result, and thus encourages a taxpayer to engage "in behavior one might suppose would implicate more tax penalties, not fewer." Keller, 556 F.3d at 1061.

The Fifth Circuit has further questioned the soundness of its reasoning in Todd, insofar as the reasoning was based on a misinterpretation of the legislative history surrounding I.R.C. § 6659 (repealed 1989), the predecessor to § 6662. See Bemont, 679 F.3d at 351–53 (panel specially concurring); see also Alpha I, 682 F.3d at 1028–30 (discussing this issue and declining to adopt the Fifth Circuit's approach); Fidelity, 661 F.3d at 673–74 (same). The concurring panel in Bemont noted that the Todd Court had relied on and interpreted the 1981 "Blue Book," a post-enactment summary of tax legislation prepared by the staff of the Joint Committee on Taxation, in analyzing § 6659's penalties assessed against tax

29

underpayments that were "attributable to" a valuation misstatement.  Bemont, 679

F.3d at 351 (citing Todd, 862 F.2d at 542–43; Staff of the Joint Comm. on

Taxation, 97th Cong., General Explanation of the Economic Recovery Tax Act of

1981 333 (Comm. Print 1981) ("Blue Book")).  In relevant part, the Blue Book

states that

> [t]he portion of a tax underpayment that is attributable to a valuation
> overstatement will be determined after taking into account any other
> proper adjustments to tax liability. Thus, the underpayment resulting
> from a valuation overstatement will be determined by comparing the
> taxpayer's (1) actual tax liability (i.e., the tax liability that results from
> a proper valuation and which takes into account any other proper
> adjustments) with (2) actual tax liability as reduced by taking into
> account the valuation overstatement. The difference between these two
> amounts will be the underpayment that is attributable to the valuation
> overstatement.

Fidelity, 661 F.3d at 673–74 (quoting Blue Book at 333).  Through the use of

further examples, the Blue Book concludes that when the IRS disallows two

different deductions, but only one disallowance is based on a valuation

misstatement, the valuation misstatement penalty should apply only to the

deduction taken on the valuation misstatement, and not to the other deduction that

is unrelated to valuation misstatement.  See Bemont, 679 F.3d at 351–52 (panel

specially concurring) (quoting Blue Book at 333 & n.2).

In Todd, however, the Fifth Circuit misapplied this guidance to a situation

30

in which the IRS disallowed a single deduction on several grounds, only one of which related to a valuation misstatement. Todd, 862 F.2d at 543–44. The Bemont Court correctly recognized that the reasoning contained in the Blue Book does not extend to a scenario in which "overvaluation is one of two possible grounds for denying the same deduction and the ground explicitly chosen is not overvaluation," but that it was nevertheless bound to follow Todd as the rule of decision. Bemont, 679 F.3d at 352, 355 (panel specially concurring). As other courts have noted in addressing this situation, the Blue Book's guidance is designed to avoid attributing to a basis or value misstatement an upward adjustment of taxes that is unrelated to the overstatement, and is instead due solely to some other, independent tax reporting error. See Alpha I, 682 F.3d at 1029–30; Fidelity, 661 F.3d at 674. This is entirely different from excusing an overstatement because it is one of two independent, rather than the sole, cause of the same underpayment error. We therefore agree with the majority of the other Circuits that have addressed this issue, and decline to adopt the reasoning of the Fifth and Ninth Circuits with regard to the application of valuation misstatement penalties in the present case.

**D.    Penalties Under I.R.C. §§ 6662A and 6663**

We also find no merit in Gustashaw's suggestion that Congress intended to

penalize taxpayers who engage in transactions devoid of economic substance solely through I.R.C. §§ 6662A and 6663, rather than through the penalties in § 6662.  Congress added § 6662A to the Code in 2004, and this provision imposes a penalty only on certain understatements made regarding reportable transactions.  See American Jobs Creation Act of 2004, Pub. L. No. 108-357, Title VIII, § 812(a), 118 Stat. 1577 (codified at I.R.C. § 6662A).  This penalty provision does not apply to instances of gross valuation misstatements, which are still determined under § 6662(h).  See I.R.C. § 6662A(e)(2)(B), cross-referencing id. § 6662(h).  By virtue of both its date of enactment and its terms, therefore, § 6662A is irrelevant to the present case.  Additionally, § 6663 penalizes underpayments attributable to fraud, and is likewise irrelevant to Gustashaw's situation.

**E.      The Reasonable Cause and Good Faith Defense in I.R.C. § 6664(c)**

As to all the penalties, Gustashaw argues that he reasonably relied on Gable's and Maulorico's advice and the Brown & Wood opinion letters regarding the legitimacy of the CARDS transaction.[6]

The Code contains an exception to otherwise-applicable penalties under I.R.C. § 6662.  See I.R.C. § 6664(c)(1).  Section 6664(c)(1) provides that "[n]o

---

[6]Gustashaw makes no argument on the negligence penalty for 2003 aside from his reasonable-reliance argument.  Thus, Gustashaw has waived any other argument on the applicability of the negligence penalty.  See Access Now, 385 F.3d at 1330.

32

penalty shall be imposed under [section 6662] . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Id. The taxpayer bears the burden of establishing that he acted with reasonable cause and in good faith. Calloway v. Comm'r, — F.3d —, No. 11-10395, 2012 WL 3599606 (11th Cir. Aug. 23, 2012).

Under the regulations, the determination of whether the taxpayer has established reasonable cause is made based on all the pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). The most important factor in this determination is the "extent of the taxpayer's effort to assess [his] proper tax liability." Id. A taxpayer may meet his burden by showing that he reasonably relied in good faith on the advice of an independent professional, such as a tax advisor, lawyer, or accountant, as to the transaction's tax treatment. United States v. Boyle, 469 U.S. 241, 251, 105 S. Ct. 687, 692–93 (1985); Treas. Reg. § 1.6664-4(c). The taxpayer's education and business experience are relevant to the determination of whether the taxpayer's reliance on professional advice was reasonable and done in good faith. Treas. Reg. § 1.6664-4(c)(1).

The professional's advice must meet several requirements. First, the taxpayer must show that the advice was based on "all pertinent facts and

circumstances and the law as it relates to those facts and circumstances." Id. § 1.6664-4(c)(1)(i).  Second, the advice relied upon must not be based on any "unreasonable factual or legal assumptions," and must not "unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." Id. § 1.6664-4(c)(1)(ii).  Third, the reasonableness of any reliance turns on the quality of the advice and whether, under the circumstances, it was objectively reasonable for the taxpayer to rely on that advice.  See 106 Ltd. v. Comm'r, 684 F.3d 84, 90 (D.C. Cir. 2012); Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States, 568 F.3d 537, 548 (5th Cir. 2009).

Reliance is not reasonable if the adviser was a promoter of the transaction or otherwise had a conflict of interest about which the taxpayer knew or should have known.  Stobie Creek Invs. LLC v. United States, 608 F.3d 1366, 1381–82 (Fed. Cir. 2010); Chamberlain v. Comm'r, 66 F.3d 729, 732–33 (5th Cir. 1995) (noting that, to establish good faith reliance on professional advice, "taxpayers may not rely on someone with an inherent conflict of interest, or someone with no knowledge concerning that matter upon which the advice is given" (footnotes omitted)).  Reliance on professional advice is likewise unreasonable when the "taxpayer knew or should have known that the transaction was 'too good to be true'" in light of all the circumstances, including the taxpayer's education,

34

sophistication, and reasons for entering into the transaction.  Stobie Creek, 608 F.3d at 1382; cf. Barlow v. Comm'r, 301 F.3d 714, 723 (6th Cir. 2002) (noting "that courts have found that a taxpayer is negligent if he puts his faith in a scheme that, on its face, offers improbably high tax advantages, without obtaining an objective, independent opinion on its validity").  In addition, reliance may not be reasonable or in good faith if the taxpayer knew or reasonably should have known that the advisor lacked knowledge in the relevant aspects of federal tax law.  Treas. Reg. § 1.6664-4(c)(1).  A tax professional's independence is only one factor in determining whether a taxpayer acted with reasonable cause and in good faith.  Id.; Stobie Creek, 608 F.3d at 1381–82.

## F.    No Clear Error in the Tax Court's Findings

We find no clear error in the Tax Court's findings that Gustashaw failed to establish that he acted with reasonable cause and in good faith regarding his underpayment of tax.  With regard to Maulorico's advice concerning the CARDS transaction, although Maulorico became familiar with the transaction through a colleague, and originally introduced the transaction to Gustashaw as an investment opportunity, he was not qualified to offer an opinion on the CARDS transaction's tax consequences and expressly declined to do so.  Maulorico was not a tax professional and lacked sufficient knowledge in the relevant aspects of federal tax

35

law.  To show that he acted with reasonable cause, Gustashaw cannot rely on the general financial planning advice provided by Maulorico when that advice failed to encompass the tax consequences of the CARDS transaction and did not analyze the relevant law as it related to Gustashaw's particular circumstances.  Treas. Reg. § 1.6664-4(c)(1).

Nor do we find persuasive Gustashaw's arguments that he was entitled to rely on the advice provided by Gable, and that such reliance was reasonable because Gable was an independent tax professional whom Gustashaw paid to render an opinion.  As for tax advice, Gable testified that he did not even understand the particular details of the CARDS transaction and that he did not have any expertise in the tax law involved.  Just as with Maulorico, Gable expressly declined to offer an independent opinion on the validity of the CARDS transaction's tax benefits.

Instead, Gable recommended that Gustashaw obtain a legal opinion regarding the CARDS transaction's validity from Brown & Wood, whom both Gable and Gustashaw knew were Chenery and Hahn's attorneys.  Gable even solicited the Brown & Wood opinion letters through Hahn, the promoter of the CARDS transaction.  Gable did not pay Brown & Wood, and knew that Gustashaw did not pay, for either the model opinion letter or the formal opinion

36

letter which, in conjunction with Gable's requests to Brown & Wood being routed through the promoter, Hahn, demonstrate that Gable should have been aware that Brown & Wood was not providing objective, disinterested tax advice.

Ultimately, the only advice that Gable provided was his opinion that Gustashaw could rely on the Brown & Wood opinion letter because it came from a major, reputable law firm, and that obtaining a second opinion would be an unnecessary expense. Yet, as noted above, Gable offered this advice knowing that Brown & Wood had been retained and paid by Chenery, and that Brown & Wood had written a model opinion letter for Chenery and Hahn to use in promoting the CARDS transaction. Further, even to the extent that Gable's statements concerning Brown & Wood's reputation qualify as advice in the traditional sense, they do not constitute tax advice on which Gustashaw was entitled to rely. In sum, the fact that Gable was an independent, paid advisor cannot outweigh the fact that he lacked the requisite knowledge to provide competent advice on the tax consequences of the CARDS transaction. See Treas. Reg. § 1.6664-4(c)(1).

Gustashaw argues that by finding that he was not entitled to rely in good faith on Gable's advice, the Tax Court effectively required him to second guess the tax professional whom he paid to provide him with tax advice. Had Gable been equipped with the relevant tax expertise and rendered his own opinion as to

37

the CARDS transaction's tax consequences, this argument would be more persuasive. However, in this case, Gable was unprepared to render an independent opinion, informed Gustashaw of this fact, and went on to obtain the opinion letter through Hahn, the CARDS transaction's promoter, from Brown & Wood. See Chamberlain, 66 F.3d at 732 (holding that a taxpayer cannot rely on someone with no knowledge of the relevant tax matters to establish good faith reliance on professional advice). Where, as here, Gable did not have the expertise necessary to provide an independent opinion regarding the tax consequences of the CARDS transaction, the Tax Court did not clearly err in determining that Gustashaw could not reasonably rely in good faith on Gable's opinion.

Finally, we find no clear error in the Tax Court's conclusion that Gustashaw's reliance on the Brown & Wood opinion letter fails to demonstrate that he acted with reasonable cause and in good faith regarding his underpayments of tax. Despite Gable's advice that Brown & Wood was a reputable firm and that obtaining a second opinion was an unnecessary expense, Brown & Wood was not an independent advisor to Gustashaw, and the opinion letter that the firm sent to Gustashaw was not tailored to Gustashaw or the CARDS transaction in which he sought to participate. Although the opinion letter did summarize Gustashaw's CARDS transaction and the amounts being loaned and distributed, the legal and

38

tax analysis contained in the opinion letter was materially identical to the model opinion letter and did not contain any particularized legal or tax analysis for Gustashaw.

The Tax Court determined that Gustashaw should have known about Brown & Wood's inherent conflict of interest caused by its affiliation with Chenery because Gable's inquiries regarding obtaining a tax opinion letter were routed through Chenery's Hahn, and Brown & Wood had been retained by Chenery to provide a model opinion letter as well as opinion letters to Chenery's individual clients, if needed.  Gustashaw did not retain Brown & Wood on his behalf, and Gustashaw never met with a representative of Brown & Wood individually or otherwise verified that Brown & Wood was acting as his agent or was fully apprised of his personal circumstances.  Cf. Van Scoten v. Comm'r, 439 F.3d 1243, 1253 (10th Cir. 2006) (holding that it was unreasonable for taxpayers to rely on tax professionals with whom they did not personally consult and who were agents of the promoter of the transaction at issue).  In addition, Brown & Wood was paid out of Gustashaw's fee arrangement with Chenery, and Gustashaw did not know how much of the $800,000 fee he paid to Chenery was sent to Brown & Wood in exchange for the firm's writing of his opinion letter.

These facts indicate that Gustashaw, if he was not actually aware of it,

39

should have known that Brown & Wood labored under a conflict of interest and that any advice provided by Brown & Wood would not necessarily be objective. See Klamath, 568 F.3d at 548. This does not mean that Gustashaw was required to understand the merits of the legal reasoning contained in the opinion letter, but rather, only shows that Gustashaw could not have relied in good faith on the opinion of Brown & Wood, an interested party, when he had reason to know about Brown & Wood's conflict of interest.

Furthermore, in light of Gustashaw's education (which included courses in accounting), nearly thirty years of business experience, and history of handling his own finances and preparing his own tax returns, all of which are relevant to the reasonable cause determination, his reliance on the Brown & Wood opinion letter becomes less reasonable. Treas. Reg. § 1.6664-4(c)(1). These factors, which show Gustashaw's level of tax-related sophistication, are particularly relevant because Gustashaw was presented with the incredible opportunity, for a fee of only $800,000, to claim a loss of $9,938,324, which offset the entirety of the tax liability generated by his exercise in 2000 of his remaining Merck Medco stock options. See 106 Ltd., 684 F.3d at 93 (concluding that "the improbable tax advantages offered by the tax shelter" should have alerted a taxpayer, who had significant business experience, to the shelter's illegitimacy). As the Tax Court

40

concluded, such a scenario, especially in light of Gustashaw's personal financial history and business sophistication, was plainly "too good to be true."

Taking (1) Gustashaw's personal experience and characteristics, (2) the failure of either Maulorico or Gable to offer independent advice on the CARDS transaction's tax consequences, (3) Brown & Wood's conflict of interest, and (4) the unbelievable benefits offered by the CARDS transaction into account, the Tax Court did not clearly err in finding that, under this particular combination of factual circumstances, Gustashaw did not have reasonable cause for his underpayment of tax or act in good faith with respect to it.

## IV.  CONCLUSION

The Tax Court correctly concluded that Gustashaw was liable for the 40% gross valuation misstatement penalties from 2000 through 2002.  In addition, we find no clear error in the Tax Court's determination that Gustashaw failed to establish that he acted with reasonable cause and in good faith with respect to his underpayment of tax.  Accordingly, the judgment of the Tax Court is affirmed.

**AFFIRMED.**