T.C. Memo. 2012-306

UNITED STATES TAX COURT

DONALD J. KIPNIS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

LAWRENCE L. KIBLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 30370-07, 30373-07.          Filed November 1, 2012.

<u>Dennis G. Kainen</u> and <u>Alan L. Weisberg</u>, for petitioners.

<u>W. Robert Abramitis</u>, <u>William Lee Blagg</u>, and <u>Brian A. Pfeifer</u>, for

respondent.

**[*2]** MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge: Respondent determined deficiencies in income tax with respect to (1) Donald J. Kipnis of $650,914 for 2000 and $346,495 for 2001 and (2) Lawrence L. Kibler of $629,361 for 2000 and $351,973 for 2001.

Donald J. Kipnis and Lawrence L. Kibler were each 50% shareholders in Miller & Solomon General Contractors, Inc. (M&S), a Florida corporation that elected to be treated as a subchapter S corporation for Federal income tax purposes. During 2000 petitioners entered into a transaction structured to generate tax losses. This type of transaction, referred to as a custom adjustable rate debt structure (CARDS) transaction, has been the subject of numerous cases in this Court. Petitioners claim they entered into the CARDS transaction primarily for nontax reasons--to obtain funds to transfer to M&S. See infra pp. 6-7. Respondent maintains the CARDS transaction lacked economic substance, and consequently he disallowed the losses generated therefrom which petitioners deducted on their respective 2000 and 2001 individual Federal income tax returns. The amounts of the losses deducted were:

|  | 2000 | 2001 |
|---|---|---|
| Donald J. Kipnis | $1,933,122 | $713,020 |
| Lawrence L. Kibler | 1,933,121 | 713,019 |

**[\*3]**   The issues for decision are:  (1) whether the CARDS transaction lacked economic substance; (2) whether the loss deductions petitioners claimed for 2000 and 2001 should be disallowed; and (3) whether petitioners were entitled to deduct certain fees paid with respect to entering into the CARDS transaction.[1]

For the reasons stated herein, we find that the CARDS transaction lacked economic substance and thus hold that petitioners are not entitled to deduct (a) the losses claimed and (b) the fees paid in connection with their entering the CARDS transaction.

All Rule references are to the Tax Court Rules of Practice and Procedure, and unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times.

## FINDINGS OF FACT

We initially note that we have been unable to reconcile the amounts petitioners paid into the CARDS transaction with the outflow amounts.  This, however, does not affect the holdings we reach herein.

---

[1]Respondent made certain computational adjustments with respect to petitioners' itemized deductions and personal exemption deductions which need not be addressed.

[*4]    Some of the facts are stipulated and are so found.  We incorporate by reference the stipulation of facts and attached exhibits.  Each petitioner resided in Florida at the time he filed his petition.

I.    Petitioners and M&S

Mr. Kipnis graduated first in his class from the University of Florida's building construction program in 1982.  Mr. Kibler graduated first in his class from the University of Florida's building construction program in 1975.  Each was highly regarded in the construction business.

Petitioners had been employees of M&S for a number of years before they acquired the business in 1985 from the company's founders, Messrs. Solomon and Miller.  Under petitioners' guidance, M&S became one of the largest general contractors in south Florida.  Although M&S built a variety of major structures, including a three-building medical school complex at Nova Southeastern, that school's Huizenga Business School, and the Miami Dolphins' training facility, it was primarily engaged in the construction of residential buildings, such as highrise condominium and apartment buildings.

In 1999 M&S incurred a loss of over $3 million in connection with its construction of a 26-story building.  That loss substantially reduced M&S'

[*5] working capital[2] just as south Florida entered a construction boom. Because of the anticipated construction boom, petitioners wanted to increase M&S' bonding capacity, which in turn required an increase in M&S' net quick. Petitioners maintain they did not want to invest their own money in M&S,

---

[2]The amount of M&S' working capital was vital because it affected M&S' ability to acquire surety bonding. Charles Nielson, an expert in surety bonding in the construction industry, see infra p. 22, testified that as a building contractor, M&S was generally required to obtain, and post with the lenders of developers who are construction clients of M&S, a surety bond guaranteeing both its performance under the construction contract and payments to its subcontractors. He further stated that in order to determine a general contractor's bonding capacity, a calculation is required to determine the contractor's (1) "net quick", (2) bonding multiplier, and (3) backlog of uncompleted work.

The contractor's "net quick" is based on the contractor's working capital. It is the difference between the contractor's current assets (exclusive of prepaid expenses) and current liabilities. Current assets consist of receivables less than 90 days old, cash, justifiable underbillings, and long-term debt (i.e., debt due in more than one year) which is subordinated by the creditor to the surety. Current liabilities are debts due within one year.

Once the net quick is calculated, the contractor is assigned a multiplier based primarily on the reputation of the contractor. A multiplier of 10 is normal. Because of M&S' reputation, its multiplier was 50. The contractor's net quick is then multiplied by its multiplier to determine the contractor's nominal bonding capacity.

After the contractor's nominal bonding capacity is determined, its available bonding capacity is determined by subtracting the contractor's backlog of uncompleted projects. For example, if the contractor's net quick is $500,000, and its multiplier is 10, its nominal bonding capacity would be $5 million. If the contractor had backlogged projects totaling $3 million, its available bonding capacity would be $2 million.

[*6] allegedly because it would be difficult to "get it back out". Petitioners purportedly attempted, but were unable, to secure long-term financing for M&S through conventional bank sources. Mr. Kipnis asked his father to lend M&S money, but he refused because M&S had previously borrowed $2.5 million from him and he had no additional funds available. Petitioners also approached Merrill Lynch (where M&S had a line of credit for short-term loans) about obtaining long-term financing, but they were rebuffed.

II.    Petitioners' Entry Into the CARDS Transaction

Michael DeSiato was both petitioners' and M&S' accountant. In 2000 he was introduced to Roy Hahn of Chenery Associates, Inc. (Chenery), the designer and promoter of CARDS transactions. Mr. Hahn explained CARDS to Mr. DeSiato who, in turn, explained it to petitioners. Mr. DeSiato told petitioners that CARDS could be the source of the type of financing that could be contributed to M&S and thus increase its net quick as well as provide tax benefits which would flow to petitioners. Mr. Kibler, with input from Mr. Kipnis and Mr. DeSiato, analyzed the CARDS transaction. In preparing his analysis, Mr. Kibler calculated the costs associated with participation in the CARDS transaction, the tax savings associated with those costs, and M&S' projected future cashflows resulting from bonding capacity multipliers of 20, 30, and 40. He determined that the profits

**[*7]** from the additional work M&S would be able to secure would more than offset the costs associated with petitioners' participation in the CARDS transaction. Projecting (1) M&S' having a bonding capacity multiplier of 40, (2) $420,936 being injected into M&S in 2000, and (3) the reinvestment of M&S' after-tax earnings into its business, using M&S' historic average gross profit margin of 5%, Mr. Kibler determined that M&S could achieve gross profits of $28,714,471 and after-tax net income of $17,343,541 by 2006.[3] After reviewing Mr. Kibler's projections, petitioners decided to enter into the CARDS transaction, doing so in December 2000.

Mr. Kibler did not examine the numerous steps of the CARDS transaction or whether it would be profitable per se. Moreover, neither Mr. Kibler nor Mr. DeSiato fully understood the complicated machinations involved in a CARDS transaction. Nor did petitioners examine the books of the other parties to the transaction or inquire whether those parties were solvent and could meet their obligations under the transaction. Nor did petitioners review the rights and obligations of each of the parties involved. But petitioners knew that by entering

---

[3]As stated supra note 2, M&S' bonding multiplier was 50, which would make its gross and net incomes higher than projected in Mr. Kibler's analysis.

[*8] into the transaction, they would be guaranteed a flow-through tax loss which could be used to offset their income.

As petitioners were reviewing the CARDS transaction, M&S was experiencing a profitable year, despite the fact that M&S' net quick was only $1.6 million by the end of 2000. According to M&S' statement of income, in 2000 its net income was $2,552,836,[4] and at no time did M&S have to forgo construction of a project because it could not get bonding.

III.    The CARDS Transaction

Chenery has implemented numerous CARDS transactions, including the one at issue in this case, and received fees for each. A portion of the fees paid to Chenery was used to pay third parties and their respective counsel in the specific CARDS transaction. See Country Pine Fin., LLC v. Commissioner, T.C. Memo 2009-251.

A CARDS transaction has three phases: (1) the loan origination phase; (2) the loan assumption phase; and (3) the operational phase. Generally, three parties are required to carry out a CARDS transaction: (1) a bank; (2) a borrower; and (3) an assuming party.

---

[4]This amount does not include the loss M&S claimed from the CARDS transaction.

**[*9]** Chenery arranged for the New York branch of Bayerische Hypo-und Vereinsbank, AG of Germany (HVB) to be the bank. HVB has participated in other CARDS transactions. See Kerman v. Commissioner, T.C. Memo. 2011-54. As a result of its involvement in the CARDS transactions, as well as its involvement in other tax shelter transactions, HVB was charged with participating in a conspiracy in violation of 18 U.S.C. sec. 371 to defraud the United States, committing tax evasion, and making false and fraudulent tax returns. HVB ultimately entered into a deferred prosecution agreement with the U.S. Department of Justice on February 13, 2006. See Gustashaw v. Commissioner, T.C. Memo. 2011-195, aff'd, __ F.3d __, 2012 WL 4465190 (11th Cir. Sept. 28, 2012); Sussex Fin. Enters., Inc. v. Bayerische Hypo-und Vereinsbank AG, No. 08-4791SC, 2010 WL 2867724, at *4 (N.D. Cal. July 20, 2010), aff'd, 460 Fed. Appx. 709 (9th Cir. 2011); Rezner v. Bayerische Hypo-und Vereinsbank AG, No. 06-02064JW, 2009 WL 8652919 (N.D. Cal. May 1, 2009), aff'd in part, rev'd in part, vacated in part, and remanded, 630 F.3d 866 (9th Cir. 2010).

The borrower in the CARDS transaction herein at issue was Wimbledon Financial Trading LLC (Wimbledon). Wimbledon was established as a Delaware limited liability company (LLC) on October 11, 2000, by Elisabeth A.D. Sylvester

**[\*10]** and Michael Sherry, both citizens and residents of the United Kingdom.[5]  Ms. Sylvester and Mr. Sherry are not strangers to this Court.  Each has participated in other CARDS transactions that have come before us, for example, in <u>Country Pine Fin. LLC</u>, where they established another Delaware LLC that acted as the borrower in that matter.

Petitioners were the assuming parties.  Shortly after they entered into the CARDS transaction, petitioners assigned their rights to receive the proceeds from their portion of the credit facility, <u>see</u> <u>infra</u> p. 16, to M&S, effective December 27, 2000.  Petitioners, however, remained liable for the loan to Wimbledon from HVB.

IV.    The CARDS Transaction at Issue

A.    Origination

On October 11, 2000, Wimbledon was formed, commencing the CARDS transaction herein at issue.  On December 5, 2000, Wimbledon entered into a credit agreement with HVB, whereby HVB agreed to lend Wimbledon €6,700,000 for a 30-year period (credit facility).  Interest on that loan accrued annually with the exception of the first and second interest periods, which occurred in the first

---

[5]Typically, a passthrough entity, the members of which are non-U.S. citizens and residents, is used to ensure that there are no U.S. income tax effects at the borrower level.

[*11] year of the loan.[6] The interest rates on the loan were to be reset annually by HVB. On each interest reset date HVB, in its sole discretion, had the right to require prepayment of the loan in its entirety. Hence the loan was in essence a one-year revolving credit facility with a cancellation option in favor of HVB.

The agreement governing the credit facility required different collateralization according to the quality of the collateral. If the collateralization consisted of cash, deposit accounts, letters of credit, or certificates of deposit, Wimbledon was required to deposit collateral equal to 102% of its obligations to HVB. If the collateral consisted of other assets, Wimbledon was required to deposit collateral equal to 108% of the obligations.

On December 5, 2000, Wimbledon informed HVB that it intended to borrow the €6,700,000 and requested that the money be credited to its account. Wimbledon issued a promissory note to HVB for €6,700,000, maturing on December 5, 2030, and HVB credited the amount to Wimbledon's account. Wimbledon entered into a master pledge and security agreement in favor of HVB, pledging as collateral all of Wimbledon's holdings at HVB. On the same day, Wimbledon purchased an HVB time deposit of €5,679,792, maturing on

---

[6]The first interest period was from December 5, 2000, to January 5, 2001. The second interest period was from the end of the first interest period to December 5, 2001. The interest rate for these periods was 5.51875%.

**[\*12]** December 5, 2001.[7]  The interest earned on Wimbledon's time deposit was 50 basis points less than the interest Wimbledon owed HVB on the loan.[8]

B.    Loan Assumption

On or about December 21, 2000,[9] petitioners and Wimbledon entered into a purchase agreement whereby Wimbledon sold each petitioner a portion of the credit facility in the form of a term deposit in the amount of €502,500 (for a total of €1,005,000), plus accrued interest, held in Wimbledon's pledged HVB account. This amounted to 15% of the €6,700,000 Wimbledon borrowed under the credit facility.  The money was transferred to petitioners' HVB account on December 27, 2000.  The purchase agreement provided that petitioners would be jointly and severally liable for all obligations under the credit facility not covered by Wimbledon's collateral.

---

[7]The record does not explain why, given the language of the credit agreement, Wimbledon's time deposit was less than the loan proceeds.

[8]As stated supra note 6, the interest rate on Wimbledon's loan for the first two interest periods was 5.51875%.  The interest rate paid on Wimbledon's time deposit was 5.01875%.

[9]On the disclosure statement attached to M&S' 2000 and 2001 Forms 1120S, U.S. Income Tax Return for an S Corporation, see infra p. 20, the date of the purchase agreement is stated to be "on or about December 5, 2000".  However, the copies of the purchase agreement in the record, of which none are signed, states the date of purchase to be "as of December 21, 2000".  We shall use December 21, 2000, as the date of petitioners' purchase.

**[*13]**   Wimbledon also entered into assumption agreements with petitioners on December 21, 2000, pursuant to which petitioners agreed to assume  joint and several liability for Wimbledon's obligations under the credit facility and the notes issued thereunder, including the repayment of the credit facility's principal of €6,700,000.  Neither petitioners nor their advisers investigated the creditworthiness of Wimbledon.

Petitioners pledged as collateral all their right, title, and interest in the deposit accounts, securities accounts, and other instruments and investment property held with HVB, as well as all proceeds thereof.  Each petitioner had the right at any time to request that any collateral be substituted, but HVB had sole discretion to approve such a substitution.

Wimbledon and petitioners agreed that Wimbledon would be responsible for interest payments on the credit facility and that petitioners would be responsible for all other amounts due under the credit facility to the extent not covered by Wimbledon's collateral.  The only amount, other than interest, not covered by Wimbledon's collateral was the €1,005,000 credited to petitioners. Petitioners waived their right of contribution against Wimbledon, even in the event Wimbledon failed to make the required interest payments.  The assumption agreement and the waiver resulted in petitioners being liable for the entire

**[*14]** €6,700,000 even though Wimbledon still maintained control over part of the proceeds. The assumption agreement and the waiver led petitioners to claim for tax purposes the entire amount of the loan (i.e., €6,700,000) as their basis in the CARDS transaction.

With these agreements in place, the three parties, Wimbledon (the borrower), HVB (the bank), and petitioners (the assuming parties), began taking a number of actions to execute the assumption of the credit facility. First, on December 21, 2000, each petitioner wired $599,000 to HVB, a total of $1,198,000, to serve as cash collateral to secure his obligation to HVB. The money was used to purchase three time deposits that would mature on December 5, 2001. Then, on December 27, 2000, pursuant to direction by Wimbledon, HVB transferred the €1,005,000 referenced in the purchase agreement into petitioners' HVB account. On that date, HVB exchanged €733,750 of the €1,005,000 credited to petitioners for $682,387.50, at a rate of .93 dollars to the euro. On January 11, 2001, HVB exchanged the remaining €271,250 of the €1,005,000 credited to petitioners for $256,331.25, at a rate of .945 dollars to the euro.

**[\*15]** Before petitioners' receipt of the money, on December 22, 2000, petitioners and HVB entered into a forward exchange contract (forward contract)[10] to exchange €1,090,000[11] for $1,037,680. The forward contract matured on December 5, 2001, the same maturity date as each of petitioners' three time deposits. Effectively, petitioners ended up in the same economic position upon the termination of the credit facility as they were in when the CARDS transaction began, thus protecting themselves from risk of loss that might otherwise result from currency fluctuations. Notably, the forward contract prevented petitioners from profiting from the exchange. See Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.[12]

---

[10]A forward contract is a contract that allows two parties to buy or sell an asset at a specified time for a specified amount. In this case the forward contract allowed petitioners to convert U.S. dollars (dollars) back into euro at the same conversion rate at which the euro were converted into dollars.

[11]The record does not reveal why petitioners entered into a contract to exchange €1,090,000 instead of the €1,005,000 received in the CARDS transaction.

[12]The record does not contain a copy of the forward contract. But the record demonstrates that both the original euro to dollar conversion and the final dollar to euro conversion were made at the same exchange rate. Moreover, because of the decline of the euro against the dollar when the CARDS transaction ended, petitioners should have received $70,200 more than they in fact received. Petitioners did not object to this shortfall at the time. Petitioners testified that they were unaware of the shortfall at the time of payment, even though they claim that

(continued...)

**[\*16]** On December 27, 2000, petitioners assigned their rights to the credit facility to M&S.

### C. Operational Phase

When petitioners deposited the $1,198,000 with HVB, HVB allowed M&S to withdraw the $1,037,680 in credit facility proceeds from the bank to use as it wished. The parties referred to this as a "collateral swap".[13] This differentiates the CARDS transaction in this case from the CARDS transactions in other cases, for in those cases the assuming parties offered to swap replacement collateral but the offers were rejected by the respective banks. Therefore in each of those other cases no collateral swap ever occurred. See Crispin v. Commissioner, T.C. Memo. 2012-70; Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.

On January 11, 2001, petitioners began using the proceeds from the credit facility by wiring (1) $382,000 from their HVB account to an account held by Chenery as the promoter of the CARDS transaction, which used a portion of these

---

[12](...continued)
they were closely monitoring the CARDS transaction.

[13]In the other CARDS transaction cases the alleged purpose was to enable the taxpayer to swap the loan proceeds from the CARDS transaction that were being held by the bank as collateral for property, presumably which then could be used to generate profits greater in amount than the costs of the CARDS transaction. See, e.g., Country Pine Fin. LLC v. Commissioner, T.C. Memo. 2009-251.

[*17] funds to pay Mr. DeSiato, and (2) $556,718.75 to M&S' account at Mellon

Bank.[14]   After the payment of additional fees to Chenery and its counsel, Lasher

Holzapfel Sperry & Ebberson P.L.L.C. (Lasher), M&S retained only $423,000 of the

funds generated by the CARDS transaction.  Thus, when all was said and done,

M&S had an additional $423,000 of net quick.  Chenery, and its counsel, Lasher,

however, had received $500,000 and $15,000 in fees, respectively.  These amounts

were either paid directly by Messrs. Kipnis and Kibler or taken from funds generated

by the CARDS transaction.

As noted supra p. 8, M&S' construction activities in 2000 were very

profitable even before petitioners entered into the CARDS transaction.  With the

proceeds from the credit facility in place, in 2001 M&S began constructing major

projects including high-rise apartments, the medical school complex at Nova

Southeastern University, the business school at Nova Southeastern University, and

a large bank branch building.  However, the results were mixed.  According to

M&S' audited financial statements, M&S' gross revenue increased from $54

million in 2000 to $82 million in 2001 and to $159 million in 2002 but sank to

$146 million in 2003.  M&S' net income was $2,552,836 for 2000, but dropped to

---

[14]In addition, on January 12, 2001, $43,900 was wired from HVB to Messrs. Kipnis' and Kibler's respective personal bank accounts.

**[*18]** $1,256,381 for 2001, rebounded to $2,006,004 for 2002, and dropped again to $1,134,965 for 2003.[15]

V.    Unwinding the CARDS Transaction

As noted supra pp. 10-11, although the credit facility involved in the CARDS transaction nominally was for 30 years, HVB had the right to terminate the transaction earlier.  HVB exercised that right on November 13, 2001, less than a year after the initiation of the CARDS transaction.  On that date HVB informed petitioners that December 5, 2001, the date that petitioners' three time deposits would mature as well as the ending date of the forward contract, would be the mandatory prepayment date.  Moreover, on that date, petitioners' deposits at HVB were converted to euro at the December 22, 2000, exchange rate pursuant to the forward contract.  Had the dollars been converted to euro at the December 5, 2001, exchange rate, petitioners would have had a $70,200 profit.  All of the borrowed funds were repaid with the pledged collateral, and no additional capital contributions were ever made.  Once the transaction closed, $143,809.07 remained in petitioners' account at HVB.  This money was wired to M&S' bank account on December 14, 2001.  At trial petitioners claimed that it was they who chose to

---

[15]These net income amounts do not include the losses generated by the CARDS transaction.

**[*19]** terminate theCARDS transaction because they were concerned about the strength of the dollar vis-a-vis the euro after the terrorist attacks of September 11.[16]

VI.   M&S' and Petitioners' Income Tax Returns

   A.   M&S' 2000 and 2001 Income Tax Returns

M&S timely filed its 2000 Form 1120S.  On Form 4797, Sales of Business Property, M&S reported a $4,548,630 basis in foreign currency sold, a sale price of foreign currency sold of $682,388, and consequently a $3,866,242 loss as a result of the December 27, 2000 euro conversion.  The high basis arose from petitioners' agreement to become liable for the entire €6,700,000 loan from HVB to Wimbledon.  As a result of the CARDS transaction, M&S claimed an ordinary loss deduction from trade or business activities of $1,540,819 for 2000.

Attached to M&S' income tax return was a disclosure statement notifying the Internal Revenue Service of the currency transaction.  The disclosure statement stated:

---

[16]When HVB terminated the CARDS transaction just one year into the 30-year term of the credit facility, petitioners told Mr. DeSiato that they were dissatisfied.  At approximately this time, petitioners learned that HVB was subject to the deferred prosecution agreement referenced supra p. 9.  They complained to Mr. DeSiato that the transaction was a ruse and that it was fictitious.  Petitioners were also angry because of incurred costs in connection with respondent's audit with respect to their reported losses arising from the CARDS transaction.

[*20] On or about December 5, 2000, Donald Kipnis and Larry Kibler (taxpayers) entered into a transaction to purchase a Credit Facility from Wimbledon Financial Trading, LLC, a Delaware LLC. They assigned the benefit of this facility to Miller and Solomon General Contractors, Inc., on December 27, 2000. The Facility was in the form of a 30 year zero coupon loan in the amount of 6.7M Euros. The Purchase Agreement was signed on December 5, 2000, and a disbursement was made in the amount of 733,210 Euros, under the terms of the Agreement. This amount was converted to dollars on which yielded $682,388. Pursuant to the opinion letter of Brown & Wood, LLP, the above taxpayers had a basis in this facility of $4,548,630, the dollar equivalent of the notional loan principal using the conversion rate at that time of .93 Dollars to 1 Euro. Basis exists based upon the taxpayer's [sic] personal liability for the loan.

The disclosure statement further revealed that M&S realized an ordinary loss of $3,866,242 under the provisions of section 988 and that petitioners incurred business expenses of $500,000 paid to Chenery that were to be applied against anticipated transaction costs. Finally, the disclosure statement stated that petitioners' business purpose in entering into the transaction was to obtain funds to contribute to M&S.

On Form 4797 attached to its 2001 tax return, M&S claimed a $1,682,370 basis in foreign currency and a sale price of foreign currency sold of $256,331 resulting in a loss of $1,426,039 as a result of the January 11, 2001 euro conversion. Again, the high basis arose from petitioners' agreement to become liable for the amount of the entire €6,700,000 loan from HVB to Wimbledon.

[*21] Taking into account the foreign currency loss, M&S claimed an ordinary loss deduction from trade or business of $243,259.

### B.     Petitioners' 2000 and 2001 Income Tax Returns

Because M&S was a subchapter S corporation, its losses flowed through to its shareholders, i.e., petitioners. Petitioners timely filed their respective Forms 1040, U.S. Individual Income Tax Return.[17] On their respective 2000 income tax returns, Mr. Kipnis and Mr. Kibler each reported a loss from M&S of $896,724. Their respective losses consisted of 50% or $770,409 of the loss reported by M&S for that year, and a prior-year suspended loss of $126,315. On their respective 2001 income tax returns, Mr. Kipnis reported a loss of $312,629 which consisted of 50% or $121,629 of the loss reported by M&S and "other expenses" of $191,000 that represented costs paid in regard to the currency transactions, and Mr. Kibler reported a loss of $312,629 which consisted of his share of the 50% of the loss reported by M&S or $121,629 and his share of the "other expenses" which was $191,000.

Respondent determined that the CARDS transaction lacked economic substance and that the loss deductions petitioners claimed were in connection with

---

[17]Petitioners filed joint returns with their respective wives. However, the notices of deficiency were issued to petitioners solely. There is no explanation for this.

**[*22]** a transaction that was "a sham in substance".  Thus, respondent increased each petitioner's distributive share of M&S' income for 2000 and 2001 as set forth supra p. 2.

VII.   The Expert Reports

Respondent submitted an expert report prepared by Dr. Lawrence Kolbe.  Dr. Kolbe's report focused on the CARDS transaction as a financing decision, and therefore it analyzed the credit facility itself, not what was done with the proceeds derived therefrom.  Dr. Kolbe concluded that the CARDS transaction was not economically rational because the expected rate of return on the amount invested did not exceed or even equal the "cost of capital", i.e., the expected rate of return in capital markets on alternative investments of equivalent risk.

Petitioners did not submit a written expert report.  Instead, they relied on the testimony of Charles Nielson as an expert in surety bonding in the construction industry.[18]  Mr. Nielson stated that the CARDS transaction was profitable if it is considered as an aspect of M&S' business strategy.  He opined that even though the costs for the credit facility were considerable, the profits generated from obtaining additional construction projects which necessitated  bonding (which in

[18]Mr. Nielson is the president of Nielson, Hoover, & Associates, one of the three largest privately owned brokers of surety bonds in the United States, and has relationships with every surety company in Florida.

[*23] turn required M&S' net quick to be increased) resulted in the CARDS

transaction's being a viable economical proposition from petitioners' viewpoint.

OPINION

I.    Introduction--The Economic Substance Doctrine

Taxpayers have the right to structure their transactions in a manner which

decreases the amount of what otherwise would be their taxes.  Gregory v.

Helvering, 293 U.S. 465, 469 (1935).  However, even if a transaction is in formal

compliance with the Code, the economic substance of the transaction determines

what is and what is not income to a taxpayer.  United Parcel Serv. of Am., Inc. v.

Commissioner, 254 F.3d 1014, 1018 (11th Cir. 2001), rev'g T.C. Memo. 1999-

268.[19]  The economic substance doctrine provides that (1) a transaction ceases to

merit tax respect when it has no economic effects other than the creation of tax

benefits (the objective test), and (2) even if the transaction has economic

_____

[19]Tax deductions are a matter of legislative grace, and the taxpayer has the
burden of proving that he is entitled to the deductions claimed.  Rule 142(a);
INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v.
Helvering, 292 U.S. 435, 440 (1934).  The burden of proof on factual issues that
affect a taxpayer's liability for tax may be shifted to the Commissioner where the
"taxpayer introduces credible evidence with respect to * * * such issue."  Sec.
7491(a)(1).  Our resolution of the issues involved herein is based on a
preponderance of the evidence, not on the allocation of the burden of proof.
Consequently, we need not consider whether sec. 7491(a) applies.  See Estate of
Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

**[\*24]** effects, it must be disregarded if it has no business purpose and its motive is tax avoidance (the subjective test).  Id.  In the Eleventh Circuit, the circuit in which an appeal of these cases lies, a transaction must satisfy both the objective and subjective tests to enable a taxpayer to claim a loss.  Id.[20]

This Court has examined other CARDS transactions promoted by Chenery. And on each occasion, we have held that the CARDS transaction lacked economic substance.  See Crispin v. Commissioner, T.C. Memo. 2012-70; Kerman v.

---

[20]The Courts of Appeals are split with respect to the proper weight to be given to these tests in deciding whether to respect a transaction under the economic substance doctrine, and alternative approaches have emerged.  See Gerdau Macsteel, Inc. v. Commissioner, 139 T.C. ___, ___ (slip op. at 60) (Aug. 30, 2012). Some Courts of Appeals apply a disjunctive analysis, under which a transaction is valid if it has economic substance or a business purpose.  See, e.g., Horn v. Commissioner, 968 F.2d 1229, 1236-1238 (D.C. Cir. 1992), rev'g Fox v. Commissioner, T.C. Memo. 1988-570.  Other Courts of Appeals apply a conjunctive analysis, under which a transaction is valid only if the transaction has economic substance beyond tax objectives and the taxpayer has a nontax business purpose for entering into the transaction.  See, e.g., Winn-Dixie Stores, Inc. v. Commissioner, 254 F.3d 1313, 1316 (11th Cir. 2001), aff'g 113 T.C. 254 (1999). Other Courts of Appeals adhere to the view that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance.  See, e.g., Coltec Indus., Inc., v. United States, 454 F.3d 1340, 1355 (Fed. Cir. 2006).  Others treat the objective and subjective tests merely as factors to consider in determining whether a transaction has any practical economic effects beyond tax benefits.  See, e.g., ACM P'ship v. Commissioner, 157 F.3d 231, 248 (3d Cir. 1998), aff'g in part, rev'g in part T.C. Memo. 1997-115.  Pursuant to Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), we follow a holding of a court to which appeal lies that is squarely on point.

**[\*25]** Commissioner, T.C. Memo. 2011-54; Country Pine Fin., LLC v. Commissioner T.C. Memo. 2009-251.

The other CARDS transactions are essentially the same as the transaction in this case, with one exception. In the other cases the taxpayers did not use the proceeds arising from the CARDS transaction to actually make an investment. Petitioners assert this difference is significant and mandates a holding that they are entitled to the loss deductions claimed because they, in fact, used the proceeds from the CARDS transaction to increase M&S' net quick.

Respondent contends that the use of the proceeds derived from the CARDS transaction is irrelevant. Specifically, respondent maintains the CARDS transaction should be treated separately from the transfer of moneys from the CARDS transaction to M&S. Respondent posits that to look to the use of the proceeds from the CARDS transaction would permit taxpayers to legitimize sham transactions by grafting them onto legitimate business transactions. Continuing, respondent argues that petitioners had no business purpose in entering into the CARDS transaction per se. In sum, respondent asserts that after all was said and

[*26] done, petitioners' primary intent was to offset their significant business income with the losses arising from their involvement in the CARDS transaction.[21]

II.    Scope of Review

As stated supra pp. 24-25, we have reviewed other CARDS transactions. In Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251, the taxpayers argued, as petitioners do, that although the CARDS transaction itself may be questionable, it was an integral part of an investment in real estate that they intended to make--integral because the real estate investments would be funded entirely through the proceeds derived from the CARDS transaction. Moreover, the taxpayers therein asserted the real estate investments had every chance of being profitable. Consequently, the taxpayers maintained that we should treat the CARDS transaction and the subsequent real estate investments as one transaction. We rejected that argument.

Initially, we noted in Country Pine Fin., LLC, that the real estate investments to which the taxpayers referred did not happen. But, more importantly, we held that even if the intended real estate investments had occurred,

---

[21]Respondent also asserts that petitioners' claimed loss deductions should be disallowed under sec. 165 because the losses were not incurred in a transaction entered into for profit and hence deductibility of the losses is limited by the at-risk rules of sec. 465. We need not, and do not, consider these arguments because of our other holdings set forth herein.

[*27] we only "look at the transaction that gave rise to the tax loss." Id. We noted that the intended real estate investment would have been a separate transaction from the one giving rise to the tax benefit, "and any profit from the real estate investment would not be a profit from the CARDS transaction." Id.; see also Am. Elec. Power Co. v. United States, 326 F.3d 737, 743 (6th Cir. 2003) (courts should not "evaluate the transaction's profitability after the challenged deduction has been allowed. To do so would swallow the sham analysis entirely"); Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254 (1999) (the possibility that tax benefits could be used as a source of funds for the taxpayer's obligations does not alter the fact that the tax plan's only function was to generate tax deductions that could offset the taxpayer's income), aff'd, 254 F.3d 1313 (11th Cir. 2001).

Petitioners respond that we are "obligated to analyze the entire transaction", see Kirchman v. Commissioner, 862 F.2d 1486, 1493-1494 (11th Cir. 1989), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986), and that "[s]egregating * * * [the tax payer's] investment * * * into two parts, as respondent suggests, would violate the principle that the economic substance of a transaction turns on a review of the entire transaction", see Salina P'ship L.P. v. Commissioner, T.C. Memo. 2000-352. Petitioners misinterpret these cases. We review the CARDS transaction separately from the transfer of the proceeds to M&S.

**[*28]** In <u>Salina P'ship L.P.</u>, the Commissioner argued that one leg of the loss-generating transaction should be segregated from the other leg, which the Commissioner conceded was economically substantive.  We rejected that argument and held that the entire transaction should be examined.  As a result of reviewing the transaction as a whole, we found that the transaction was economically substantive and held that the taxpayer was entitled to claim its losses.  In <u>Kirchman</u>, the Court of Appeals for the Eleventh Circuit, in upholding our Opinion, reviewed the transaction as a whole, instead of merely examining the one leg of the transaction that generated the loss, and held that the entire transaction lacked economic substance.

III.     Application of the Economic Substance Test

      A.     The Objective Test

The objective test involves a broad examination of whether, from an objective standpoint, the transaction would likely produce economic benefits other than generate a tax deduction.  <u>Kirchman v. Commissioner</u>, 862 F.2d at 1492 (citing <u>Bail Bonds by Marvin Nelson, Inc. v. Commissioner</u>, 820 F.2d 1543, 1549 (9th Cir. 1987), <u>aff'g</u> T.C. Memo. 1986-23);  <u>see also</u> <u>Knetsch v. United States</u>, 364 U.S. 361, 365-366 (1960) (transaction not recognized because there was nothing of substance to be realized by the taxpayer from the transaction in

[*29] question beyond a tax deduction). "A reasonable opportunity for profit will ordinarily be found only if there was a legitimate expectation that the nontax benefits would be at least commensurate with the associated transaction costs." Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225.

The CARDS transaction in this case is virtually identical to the transactions in Country Pine Fin., LLC, Kerman, and Crispin. Indeed, HVB became familiar to us in Kerman and returned in Gustashaw v. Commissioner, T.C. Memo. 2011-195.[22] And as stated supra pp. 9-10, the members of Wimbledon, Ms. Sylvester and Mr. Sherry, were first introduced to us in Country Pine Fin., LLC and came before us again in Kerman.

At trial petitioners conceded that the CARDS transaction per se had no profit potential aside from currency fluctuations. And we are mindful that the manner in which the CARDS transaction was structured and executed prevented petitioners from profiting from currency fluctuations. Petitioners candidly testified that they did not research currency trading before entering the CARDS transaction and that they did not consult an expert in the field. Indeed, M&S' accountant, Mr. DeSiato, was unaware of any intent on petitioners' part to profit

---

[22]The taxpayers in Gustashaw v. Commissioner, T.C. Memo. 2011-195, aff'd, __ F.3d __, 2012 WL 4465190 (11th Cir. Sept. 28, 2012), conceded that their CARDS transaction lacked economic substance.

**[*30]** from the currency market. Further, while considering the CARDS transaction, petitioners did not give "much thought" to profiting from the CARDS transaction itself, and they never developed a strategy to profit from currency fluctuations.

The forward contract entered into by petitioners and HVB ensured that the conversion of dollars back into euro at the end of the CARDS transaction would be at the same rate as used to convert the borrowed euro into dollars at the beginning of petitioners' participation in the transaction. As a result, HVB was protected from unfavorable currency fluctuations. And we doubt that HVB would have participated in the CARDS transaction without such protection. Moreover, when the CARDS transaction was terminated, the dollar had increased in value vis-a-vis the euro. Consequently, petitioners should have received $214,000 at the conclusion of the transaction, but in fact they received $143,809.07.

In any case, even if petitioners could have profited from the currency transaction, they did not provide any evidence concerning the amount of profits from the currency fluctuations they could have made. Further the $70,200 (i.e., $214,000 less $143,809.07) involved is minimal in comparison to the $5,292,282 petitioners ultimately deducted or to the nearly $1.2 million petitioners paid to participate in the CARDS transaction. See Kirchman v. Commissioner, 862 F.2d

**[*31]** at 1494 (minimal risks of profit or loss are insufficient to provide economic substance to a transaction); see also Sala v. United States, 613 F.3d 1249, 1254 (10th Cir. 2010) (the transaction lacked economic substance where the potential profits were dwarfed by the expected tax benefit); Jade Trading, LLC v. United States, 598 F.3d 1372, 1377 (Fed. Cir. 2010) (a transaction lacks economic substance if it provides a disproportionate tax benefit compared to the amount invested and the potential return).

In reviewing the CARDS transaction without reference to the transfer of the proceeds to M&S, we find Dr. Kolbe's report persuasive that the CARDS transaction lacked economic substance. Indeed, petitioners, in the light of their concession, do not dispute Dr. Kolbe's expert report that the CARDS transaction lacked profit potential and was cashflow negative, guaranteeing them a tax loss. Dr. Kolbe noted that the CARDS transaction reduced petitioners' wealth by more than $500,000 and would have reduced it even more had the CARDS transaction lasted longer than one year. This loss would exist no matter what investments petitioners made with the proceeds because the same investments could have been financed by a more conventional type of loan, and the artificial, unrelated loss would remain even if we accepted petitioners' position that we should consider the

[*32] transfer of the proceeds to M&S as part of the CARDS transaction. See Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.

### B. The Subjective Test

Initially, we note that if a transaction fails the objective test, the subjective motive of the taxpayer is irrelevant. See Kirchman v. Commissioner, 862 F.2d at 1492. The subjective test reviews the intent or business purpose of the taxpayer. Having a business purpose does not mean the reason for a transaction is free of tax considerations, but the purpose must be one that "figures in a bona fide, profit-seeking business." United Parcel Serv. of Am. v. Commissioner, 254 F.3d at 1019. Thus, a transaction that would not have occurred in any form but for tax avoidance reasons would not have a business purpose. Id. at 1020.

Petitioners were unequivocal about one thing: Any contribution to M&S had to be in the form of a loan. Contributing their own money to M&S was not an option. Both petitioners and their witnesses explained that the construction industry was built on leverage. Moreover, Mr. Kipnis was emphatic that personal considerations prevented him from putting his own money into M&S. And yet, after all was said and done, Messrs. Kipnis and Kibler spent nearly $1.2 million of their own money in order for $423,000 to ultimately reach M&S. No genuine

[*33] leveraging arose from the CARDS transaction.  Petitioners deposited $1,198,000 into accounts at HVB.  HVB then advanced to petitioners $1,037,680.  After paying fees to the transaction promoters, the promoters' lawyers, and their accountant, petitioners contributed the remaining money, $423,000, to M&S.[23]

Had petitioners' actions matched their stated intent, M&S would have repaid the credit facility out of M&S' growing gross business revenues.  But when HVB terminated the CARDS transaction and demanded prepayment of the credit facility, M&S did not repay the credit facility.  Rather, the personal funds petitioners had deposited in HVB were used.

Petitioners stated that they could not convince a U.S. bank to offer M&S a loan (presumably a conventional loan) because M&S had no assets which could collateralize such an advance.  We believe, however, that petitioners could have borrowed money from a U.S. bank on the same terms as those obtained at HVB, or better.  We have no doubt but that the receipt of $423,000 in proceeds derived from the CARDS transaction could have been obtained at far less cost had petitioners used a U.S. bank.  But we are mindful that borrowing money from a U.S. bank

---

[23]The structure of the CARDS transaction makes it clear that despite the appearance of a loan, functionally petitioners never took on any actual debt.  In order to withdraw the funds from HVB, petitioners were required to deposit a like amount in HVB as replacement collateral.

[*34] would not have provided petitioners with the tax losses the CARDS

transaction promised.

IV.     Fees Paid To Enter Into the CARDS Transaction

Petitioners paid $500,000 to Chenery and $15,000 to Lasher to participate in

the CARDS transaction, a total of $515,000.  As noted supra pp. 16-17, petitioners

wired $382,000 of the credit facility's proceeds to pay part of these fees.

Petitioners paid the remaining fees out-of-pocket.  Respondent determined that

payment of the $382,000 in fees was for the purpose of purchasing a prestructured

transaction that guaranteed petitioners a tax loss and thus disallowed the deduction

claimed for that payment.

Fees incurred in connection with a sham transaction are generally not

deductible.  Winn-Dixie Stores, Inc v. Commissioner, 113 T.C. at 294; see also

New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161 (2009) (fees to

implement a transaction held to lack economic substance are not deductible),

aff'd, 408 Fed. Appx. 908 (6th Cir. 2010).  Courts have upheld deductions based

on genuine debts where the debts are elements of a transaction that overall is

lacking in economic substance.  See Rice's Toyota World, Inc. v. Commissioner,

752 F.2d 89, 95-96 (4th Cir. 1985) (allowing deductions based on recourse note

debt that was an element of a sham transaction because the notes represented actual

[**\*35**] indebtedness), <u>aff'g in part, rev'g in part</u> 81 T.C. 184 (1983). But the overall

transaction must have economic substance in order to show genuine indebtedness;

otherwise "'every tax shelter * * * could qualify for an interest expense deduction

as long as there was a real creditor in the transaction that demanded repayment.'"

<u>Klamath Strategic Inv. Fund v. United States</u>, 568 F.3d 537, 550 (5th Cir. 2009)

(quoting <u>Winn-Dixie Stores v. Commissioner</u>, 113 T.C. at 279). In this matter the

CARDS transaction lacked economic substance in part because there was no

genuine indebtedness. As stated <u>supra</u> note 23, petitioners never took on any

actual debt in the CARDS transaction. In order to withdraw loan proceeds from

HVB, petitioners were required to deposit a like amount in the bank.

Economically, nothing of substance had changed. Since the CARDS transaction

did not constitute indebtedness, petitioners may not deduct the expenses related to

the CARDS transaction. Petitioners offer no reason the fees in this case should be

treated differently from fees in prior CARDS transaction cases. Consequently, we

uphold respondent's disallowance of these deductions.

V.    <u>Conclusion</u>

Petitioners' CARDS transaction lacked economic substance. It could not be

profitable, and petitioners did not have a business purpose for entering into the

**[\*36]** transaction.  Because we find that the CARDS transaction lacked economic substance, it is to be disregarded for tax purposes and petitioners' claimed loss deductions are  disallowed.  As a result, petitioners may not deduct the fees related to the transaction.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.