[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14573

_____

Agency No. 010181-08

CURTIS INVESTMENT COMPANY, LLC,

Plaintiff - Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Defendant - Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court

_____

(December 6, 2018)

Before WILSON and JORDAN, Circuit Judges, and GRAHAM,* District Judge.

WILSON, Circuit Judge:

In 2000, Curtis Investment Company (CIC) entered into a tax avoidance

scheme known as a CARDS transaction, allowing it to claim a $27,724,620 capital

_____

* Honorable James L. Graham, United States District Judge for the Southern District of Ohio,
sitting by designation.

loss on its annual tax return.  In 2007, the Internal Revenue Service (IRS) Commissioner issued a Final Partnership Administrative Adjustment (FPAA) disallowing CIC's claimed capital loss and fee deductions on its 2000 tax return. The IRS also applied a gross valuation misstatement penalty under 26 U.S.C. §§ 6662 and 6664.  CIC challenged the FPAA and penalties in Tax Court; the court upheld both.  CIC now contends that the Tax Court erred by incorrectly applying the "economic substance" analysis and ignoring facts that supported CIC's reasonable cause defense.  After review and with the benefit of oral argument, we affirm the Tax Court's determinations.

## I. Factual and Procedural Background

### A. CARDS Basics

A Custom Adjustable Rate Debt Structure (CARDS) transaction is a tax-avoidance scheme involving a series of pre-arranged steps whereby (1) a tax-indifferent party not subject to U.S. taxation borrows foreign currency from a foreign bank, with interest due annually and principal due in a single "balloon" payment 30 years in the future, (2) a U.S. taxpayer purchases a small percentage of the loan proceeds—in the form of foreign currency or the bank's promissory note—in exchange for taking on joint liability for the entire loan, and (3) the U.S. taxpayer then exchanges the purchased foreign currency for U.S. dollars or redeems the promissory note.  Currency exchanges and promissory note

2

redemptions are taxable occurrences.  The U.S. taxpayer claims that its tax basis in the exchanged currency or redeemed note is the full amount of the loan proceeds, not just the small percentage it actually paid for.

Section 1012 of the Internal Revenue Code provides that a taxpayer's basis in property is generally equal to its "cost" of acquiring the property, including any assumption of a seller's liabilities.  This rule is premised on the expectation that buyers will fully pay the assumed liabilities.  *See Comm'r v. Tufts*, 461 U.S. 300, 308–09, 103 S. Ct. 1826, 1831–32 (1983).  In a CARDS transaction, the U.S. taxpayer is nominally responsible for payment of the entire principal amount of the tax-indifferent party's loan and thus can claim the entire amount as its basis.  In these transactions, however, banks always "call" such loans after about one year, when a large percentage of the tax-indifferent party's loan proceeds are available to pay the loan at that time.  Thus, the U.S. taxpayer is responsible for only slightly more than its small share of the loan proceeds rather than the entire loan amount but can still claim a large, artificially inflated tax loss to shelter unrelated income.

In August 2000, the IRS issued Notice 2000-44, warning taxpayers about generating artificial losses from schemes that purported to inflate their basis in assets.  I.R.S. Notice 2000-44, 2000-2 C.B. 255.  In March 2002, the IRS issued another notice that more specifically targeted the technical argument underlying CARDS transactions and imposed disclosure obligations on CARDS shelters'

3

promoters and participants. *See* I.R.S. Notice 2002-21, 2002-1 C.B. 730. In 2005, the IRS offered a settlement initiative whereby taxpayers could avoid litigation and liability for a gross valuation misstatement penalty by conceding the claimed tax benefits from their CARDS shelters and paying a reduced penalty. *See* I.R.S. Announcement 2005-80, 2005-2 C.B. 967.

### B. CIC's Background

Curtis Investment Company (CIC) is an investment holding company formed by Henry Curtis for the benefit of his family. Lonnie Baxter was named CIC's managing partner in 1986.[1] Prior to 1995, Baxter made CIC's investment decisions with assistance from private money managers. In 1995, CIC hired Eric Zimmerman as an internal investment advisor. CIC alleges that, since 1997, it has also relied upon business experts including Matt Levin, Barbara Coats, and others at Windham Brannon (Windham), as well as Thomas Rogers and his firm, Rogers & Watkins, for tax and business advice.

In 1998, Henry "Jay" Bird—son of Lonnie Baxter and president of a mortgage company called Birdhouse Mortgages—became managing partner of CIC. Bird formed an Investment Committee that, along with Zimmerman, created an asset-allocation plan for CIC. CIC planned to diversify its portfolio, borrowing

---

[1] Lonnie Baxter and her husband, Guy, individually participated in a CARDS scheme as well; their tax deficiency case was consolidated with CIC's in Tax Court. The Baxters are appealing their case in the Fourth Circuit. *Baxter v. Comm'r*, No. 17-2402 (4th Cir. filed Dec. 7, 2017).

4

funds at a low interest rate to make investments that would yield returns greater than the interest cost.

CIC's principal asset prior to February 2000 consisted of stock in American Business Products (ABP). ABP was sold via stock sale in February 2000, generating a $27–28 million capital gain for CIC. CIC's accountants estimated that CIC's partners would owe approximately $7 million in taxes on the gain realized on the ABP stock sale.

*C. CIC's CARDS Transaction*

In the fall of 2000, Barbara Coats of Windham learned about CARDS transactions from Roy Hahn, founder of Chenery Associates, Inc. (Chenery).[2] After advisors from Windham met with Hahn, he presented a CARDS transaction proposal to Henry Bird and CIC. The transaction would involve a 30-year €35.3 million loan from HVB, a foreign bank,[3] to Brondesbury Financial Trading, LLC (Brondesbury), a foreign tax-indifferent entity.[4] The loan included a €5.295 million promissory note; CIC would purchase this note and assume joint and several liability on the full €35.3 million loan. Brondesbury would hold the

---

[2] Chenery was a San Francisco-based investment firm that developed and marketed CARDS plans.

[3] HVB stands for HVB Structured Finance, Inc., a subsidiary of Bayerische Hypo-Und Vereinbank, AG. HVB was the bank that provided the loan in this CARDS transaction.

[4] Brondesbury was formed on December 11, 2000, and consisted of two British residents.

5

residual €30 million in a HVB deposit account to pay interest, making CIC's €5.295 million note interest-free.

CIC contends that its advisors investigated the proposed transaction and parties involved. CIC negotiated loan terms and refused to proceed with the transaction unless it could invest its interest-free loan proceeds in other investment opportunities. CIC allegedly relied on Rogers & Watkins and Windham to independently analyze the tax consequences of CARDS transactions. These advisors studied a draft opinion letter from Brown & Wood (B&W), a New York law firm, which suggested that it was "more likely than not" that CARDS transactions had economic substance. While Chenery said that CIC's tax benefits resulting from the CARDS transaction would be permanent, CIC alleges that its advisors at Windham said its taxes would be spread, not eliminated. In December 2000, CIC's Investment Committee approved a "Capital Leverage" plan including the CARDS transaction.

HVB deposited 85% of the €35.3 million loan proceeds into a one-year time deposit at HVB, and disbursed the remainder in the form of a one-year €5.592 million promissory note payable to Brondesbury. CIC purchased the €5.592 million note from Brondesbury and, in exchange, took on joint and several liability for 100% of Brondesbury's €35.3 million debt to HVB. CIC agreed to comply with the HVB/Brondesbury credit agreement and to provide a $6.7 million letter of

6

credit from Canadian Imperial Bank of Commerce (CIBC) in favor of HVB as substitute collateral in place of the HVB note.[5]  In December 2000, CIC entered into a one-year forward contract with HVB which would allow CIC to convert U.S. dollars into euros on December 14, 2001 at a specified rate: 0.9402 dollar-to-euro.[6]

Brondesbury's collateral—the €30.005 million time deposit— was the first source of payment for all obligations to HVB under the credit agreement.  CIC alleges that HVB confirmed that the €35.3 million loan would last for 30 years, until December 14, 2030.[7]  If the credit agreement remained in place, Brondesbury's collateral would decrease over time due to net outflows of interest, and CIC would have to increase the CIBC line of credit.  If the loan lasted for 30 years, CIC would pay interest directly to HVB for the last four years of the term.

After purchasing the €5.592 million note from Brondesbury, CIC redeemed the note and directed HVB to exchange it for $4,892,580, which CIC deposited into a CIBC interest-bearing account.  CIC allocated the proceeds among its chosen asset managers six weeks later, at the next Investment Committee meeting on February 15, 2001.

---

[5] This letter of credit was to terminate on December 27, 2001.

[6] Forward contracts allow parties to exchange an asset at a specified time for a specified amount.

[7] Although the agreement's expiration date was December 14, 2030, provisions of the agreement and related financial instruments had one-year terms, and Brondesbury's 85% collateral was kept in a one-year time deposit.

CIC paid Chenery $1,938,465 for its CARDS plan and paid CIBC $241,000 in upfront fees for its letter of credit. CIC's payment to Chenery included indirect payments to Brondesbury and HVB, as well as an indirect payment of $50,000 to B&W for an opinion letter regarding the legality of CARDS plans.[8] In total, these CARDS transaction fees constituted around 45% of the amount received by CIC.

On November 13, 2001, CIC's advisors learned that HVB planned to call its loans to CIC and the Baxters.[9] CIC then received a mandatory prepayment election, negotiated a traditional margin loan from CIBC for $8.5 million, and used part of that margin loan to satisfy its obligations to HVB. Because Brondesbury's collateral account at HVB still contained most of the original loan amount, CIC only paid the equivalent of $5,378,764.49 to retire the entire €35.3 million HVB loan. CIC used $5,369,208.60 of the margin loan proceeds to purchase €5,710,709 from HVB pursuant to their December 2000 forward contract, which it then applied to its HVB loan obligation; the forward contract proceeds covered all but approximately $9,550 of CIC's final payment obligation on the €35.3 million loan.

On its U.S. Return of Partnership Income (Form 1065) for 2000, CIC reported a long-term capital gain of $28,597,759 from the ABP stock sale and

---

[8] The Tax Court noted that this letter was promised as part of the CARDS package and Chenery's fees were used to pay B&W, indicating that B&W had a conflict of interest. Furthermore, executive actors at Chenery (Roy Hahn) and B&W (R.J. Ruble, CIC's contact at the firm) were clearly connected.

[9] Levin testified that HVB told him it was withdrawing due to the events of September 11, 2001.

claimed a $27,724,620 capital loss generated through its CARDS transaction.  In calculating this loss, CIC treated the full amount of the HVB debt ($32,617,200) as its basis in the HVB promissory note that it redeemed for $4,892,580, under the theory that CIC had assumed joint and several liability for the entire HVB loan.  CIC also claimed a fee deduction of $1,400 for amortized loan origination fees paid as part of the CARDS transaction.  CIC alleges that it relied upon Windham to prepare its tax returns and that Windham assured CIC that it viewed the tax treatment as correct.

### D. Post-CARDS Transaction

In 2007, the IRS issued a FPAA disallowing CIC's claimed $27,724,620 capital loss and $1,400 fee deductions on its 2000 tax return.  The IRS raised alternative grounds for disallowing the claimed loss, including (1) CIC's failure to establish its claimed basis and (2) the lack of economic substance in the CARDS transaction.[10]  The IRS also imposed a gross valuation misstatement penalty.

In 2008, CIC petitioned for redetermination of its 2000 FPAA.  The Tax Court held a condensed four-day trial for CIC and the Baxters (collectively referred to as Taxpayers).  *Curtis Inv. Co., LLC v. Comm'r*, No. 10181–08, 16835–08, 2017 WL 3314283, 114 T.C.M. (CCH) 141 (2017).[11]  During the trial, CIC

---

[10] In addition, the IRS maintained that CIC's claimed fee deduction lacked economic substance.
[11] The Tax Court made findings with respect to all Taxpayers in a single opinion.

presented two experts[12] to challenge its FPAA determination, and the IRS introduced an expert report by A. Lawrence Kolbe.[13] Dr. Kolbe focused on Taxpayers' CARDS transactions as financing decisions and did not analyze subsequent investments, concluding that the transactions were not economically rational because the expected rate of return did not exceed or equal the expected rate of return in capital markets on alternative investments of equivalent risk.[14] According to the report, the transaction fees were substantially higher than those for a loan that would yield similar proceeds, and the loan interest rate was higher than market interest rates, without fees. The report determined that the loans were unprofitable financing decisions. CIC challenged Dr. Kolbe's report under Federal Rule of Evidence 702, arguing that he should not be admitted as an expert witness. The Tax Court admitted Dr. Kolbe's testimony.

After trial, the Tax Court issued an opinion upholding the FPAA determinations, concluding that the CARDS transactions objectively lacked economic substance. The court also held that Taxpayers lacked a business purpose

---

[12] James A. Walker, Jr. testified regarding commercial lending practices but did not address the profit potential or business purpose of the CARDS transaction. Walker has 47 years of banking experience and an M.B.A. from Georgia State University. Dr. Conrad S. Ciccotello testified that Taxpayers could have profited from CARDS transactions if their annual returns exceeded 9.5%. Dr. Ciccotello has a Ph.D in finance from Pennsylvania State University and is a professor at Georgia State University.

[13] Dr. Kolbe holds a Ph.D. in economics from the Massachusetts Institute of Technology and previously served as an expert witness in Tax Court cases involving CARDS transactions.

[14] Dr. Kolbe's analysis suggested that the loans would reduce Taxpayers' wealth by €2.19 million regardless of the return from the investments.

10

for engaging in the CARDS transactions.  Finally, the court upheld imposition of accuracy-related penalties, finding that (1) Taxpayers' claimed basis in their redeemed notes was entirely eliminated, and (2) Taxpayers lacked reasonable cause for their tax positions.  CIC appealed.  On February 27, 2018, CIC also filed a letter with this Court pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure,[15] asserting a new challenge to the Tax Court's imposition of an underpayment penalty under 26 U.S.C. § 6571(b)(1).

## II. Economic Substance and Business Purpose of the CARDS Transaction

### A. The Tax Court's Analysis

CIC argues that the Tax Court failed to consider part of the transaction at issue here, leading the court to incorrectly conclude that CIC's transaction lacked economic substance or business purpose other than the generation of tax benefits. We review the Tax Court's legal conclusions regarding the Internal Revenue Code de novo, and its findings of fact for clear error.  *Campbell v. Comm'r*, 658 F.3d 1255, 1258 (11th Cir. 2011) (per curiam).  Under the clear error standard, "where

---

[15] Rule 28(j) states:

> If pertinent and significant authorities come to a party's attention after the party's brief has been filed—or after oral argument but before decision—a party may promptly advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations.  The letter must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally.  The body of the letter must not exceed 350 words.  Any response must be made promptly and must be similarly limited.

FED. R. APP. P. 28(j).

11

there are two permissible views of the evidence, the tax court's choice between them cannot be clearly erroneous." *Piggly Wiggly S., Inc. v. Comm'r*, 803 F.2d 1572, 1576 (11th Cir. 1986). Factual findings based on credibility assessments are entitled to particular deference. *See id.*

Section 165(a) of the Internal Revenue Code allows deductions for any losses that are actually sustained, and not otherwise compensated for, during the taxable year. 26 U.S.C. § 165(a). "Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." Treas. Reg. § 1.165-1(b). "[F]ederal tax law disregards transactions lacking an economic purpose which are undertaken only to generate a tax savings. Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked." *United States v. Heller*, 866 F.2d 1336, 1341 (11th Cir. 1989). A transaction is not entitled to tax respect if it "lacks economic effects or substance other than the generation of tax benefits, or if the transaction serves no business purpose." *Winn-Dixie Stores, Inc. v. Comm'r*, 254 F.3d 1313, 1316 (11th Cir. 2001) (per curiam). If a transaction lacks either objective economic effects or subjective business purpose, it will be disregarded for tax savings. *See Kearney Partners Fund, LLC v. United States*, 803 F.3d 1280, 1295 (11th Cir. 2015) (per curiam); *United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001).

12

Courts evaluating a transaction for economic substance and business purpose should exercise common sense, looking at the totality of evidence and focusing on "the specific transactions at issue, not the activities of the entity as a whole." *Kearney Partners Fund*, 803 F.3d at 1295. A transaction objectively has economic substance when it has economic effects other than creation of tax deductions—that is, it has "a reasonable possibility of making a profit." *Id.* "The kind of 'economic effects' required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party." *United Parcel Serv. of Am.*, 254 F.3d at 1018. Taxpayers may use the Internal Revenue Code to their advantage, and therefore our subjective "business purpose" analysis distinguishes between legitimate transactions structured in a particular way to obtain tax benefits and illegitimate transactions *created* to generate tax benefits. *Kearney Partners Fund*, 803 F.3d at 1295.

The Tax Court properly focused on the CARDS transaction as the specific transaction generating the tax benefit—the artificial loss—at issue in CIC's 2000 tax returns. *See Gustashaw v. Comm'r*, 696 F.3d 1124, 1136–37 (11th Cir. 2012) (finding that a taxpayer's "tax underpayments were 'attributable to' a gross valuation misstatement within the meaning of § 6662" because the taxpayer "report[ed] an artificially inflated basis in currency" and "the abusive tax shelter is built upon the basis misstatement, and the transaction's lack of economic substance

13

is directly attributable to that misstatement"). CIC argues that it was motivated by a business purpose and its transaction had economic effects other than tax consequences because CIC planned to make a net profit from investments with proceeds of the interest-free loan it obtained in its CARDS transaction. These investments, however, were collateral to the CARDS transaction and did not contribute to CIC's ability to claim a tax benefit—thus, they are not considered to be part of the "specific transaction."[16] If we were to accept CIC's reasoning and include its investments in the relevant "transaction" here, any taxpayer could manufacture a transaction to obtain tax benefits and justify it as a financing decision with a legitimate business purpose by planning to use the potentially ill-gotten proceeds in a peripheral high-return investment. All taxpayers are legally permitted to structure transactions to obtain tax benefits, but they may not manufacture certain transactions solely to avoid paying taxes, which is what CIC did here. *See Kearney Partners Fund*, 803 F.3d at 1295.

The Tax Court concluded that the CARDS transactions reduced Taxpayers' wealth by over €2 million and would have cost even more after one year—therefore, there was no reasonable possibility of profit. While CIC may have had a business purpose to borrow funds for long-term investment, it had no legitimate

---

[16] CIC's 2000 tax return claimed a loss equal to the amount of HVB's loan to Brondesbury less the amount of the promissory note redeemed by CIC, supporting the conclusion that the CARDS financing scheme alone was the loss-generating transaction, making it subject to analysis here.

14

business purpose for choosing this particular financing plan, which left considerably less money for investment than conventional financing. Moreover, the Tax Court found that CIC did not consider financing alternatives and made no attempt to reduce its cost of borrowing to maximize funds available for investment. Instead, CIC used a new bank—HVB—and paid financing costs of approximately 45% of the proceeds of its loan.[17] The Tax Court discussed further evidence, including multiple one-year timeframes in documents related to the transaction,[18] suggesting that CIC did not truly enter into the CARDS transaction for long-term investment purposes and did not reasonably believe that it had taken on a genuine enforceable obligation to repay the full HVB debt. The court thus concluded that CIC's CARDS transaction objectively lacked economic substance and subjectively lacked a non-tax business purpose. The CARDS transaction is not entitled to tax respect if it lacks either of these qualities; the Tax Court found that it lacked both,

---

[17] The Tax Court determined that the fees CIC paid to Chenery and CIBC were significantly above market rates for comparable financing options, creating a substantial and unnecessary drag on the profitability of any investments. Taking these fees into account, CIC only obtained around $2.25 million in investable funds.

[18] The Tax Court noted that several items—including Brondesbury's time deposit at HVB, CIC's forward contract with HVB, and CIC's CIBC letter of credit—had one-year timeframes, indicating the loan would not last for 30 years. The Tax Court thus did not find credible CIC's claim that HVB called the loan due to the events of September 11, 2001, nor that CIC believed it would liable for the full HVB debt as the primary obligor bearing direct recourse liability to Brondesbury for 30 years. Furthermore, CIC rushed to finalize its CARDS transaction before the end of tax year 2000, but did not invest the resulting proceeds for nearly six weeks. The Tax Court found that the specific timing of the transaction and subsequent investment of proceeds cut against CIC's claim that it pursued the CARDS transaction for investment purposes.

15

and thus should be disregarded for tax savings.  The findings of fact and credibility determinations made in reaching this conclusion do not constitute clear error.

### B. Expert Witness Testimony

In concluding that CIC's CARDS transaction lacked economic substance and business purpose, the Tax Court relied heavily on a report from the IRS expert witness, Dr. Kolbe.  Relying on Rule 702 of the Federal Rules of Evidence, CIC argues that Dr. Kolbe should have been excluded from testifying as an expert because he is not qualified, he is unreliable, and his methodology incorrectly segregates finance from investment.

We review a trial court's decision to admit expert testimony for abuse of discretion.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1170 (1999).  "That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion."  *Id.*; *see also Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 808 (11th Cir. 2017).

Federal Rule of Evidence 702 governs admission of expert testimony in Tax Court.  26 U.S.C. § 7453, FED. R. EVID. 702.[19]  In *Daubert v. Merrell Dow*

---

[19] Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

*Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 compels district

courts to screen expert scientific evidence for admissibility, and elaborated upon

what courts should consider in applying the Rule.  509 U.S. 579, 589–595, 113 S.

Ct. 2786, 2795–98 (1993).  In *United States v. Frazier*, we summarized

considerations for trial courts determining the admissibility of expert testimony:

> (1) [If] the expert is qualified to testify competently regarding the matters he intends to address; (2) [if] the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) [if] the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).  The basic requirements—

qualification, reliability, and helpfulness—are distinct, but may overlap.  *Id.*  A

witness's knowledge, training, skill, education, or experience may qualify her as an

expert.  *Id.* at 1260–61.

When determining the reliability of an expert's opinion, a trial court must

assess "whether the reasoning or methodology underlying the testimony is

scientifically valid and . . . whether that reasoning or methodology properly can be

applied to the facts in issue."  *Id.* at 1261–62.  The court should consider, to the

---

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

17

extent practicable, (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the method is generally accepted in the relevant community. *Id.* at 1262; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 1174–75 (1999) (extending this analysis to experts with "specialized knowledge"). "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Frazier*, 387 F.3d at 1262. This flexible analysis requires that trial judges "have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. (citing *Kumho Tire Co.*, 526 U.S. at 152, 119 S. Ct. at 1176 (1999)).

"[A]pplication of an abuse-of-discretion standard recognizes a range of possible conclusions that the trial judge may reach." *Id*. at 1266. The Tax Court's initial decision to admit the testimony of all three proffered experts with extensive cross-examination and argument, and then to rely primarily on the testimony of Dr. Kolbe, was within its discretion. The Tax Court noted Dr. Kolbe's relevant qualifications[20] and considered CIC's evidence regarding his unreliability—

_____

[20] CIC asserts that Dr. Kolbe has no experience as a loan officer or broker, and did not consult any banks in evaluating CIC's CARDS transaction. We do not, however, require that all expert

particularly his potential bias due to significant compensation from the IRS for expert testimony in prior cases—before determining that Dr. Kolbe was qualified, reliable, and provided useful testimony.  Moreover, the court considered the testimony and cross-examination of all expert witnesses to determine that Dr. Kolbe's method—focusing on the transaction that generated CIC's claimed tax benefit—was the most reliable and instructive evaluation.  Given its thorough analysis, the Tax Court did not abuse its discretion in admitting, weighing, or relying upon Dr. Kolbe's testimony.

### III. Imposition of the Underpayment Penalty

CIC argues that, even if its CARDS transaction lacked economic substance and business purpose, CIC should not be subject to an underpayment penalty for the amount of the loss resulting from the CARDS transaction because it made the understatement on its 2000 return with reasonable cause and good faith.  "Whether a taxpayer acted with reasonable cause and in good faith with regard to an underpayment of tax is a question of fact that we review for clear error." *Gustashaw*, 696 F.3d at 1134.  Section 6662(a) imposes a 20% accuracy-related penalty on underpayment of tax for reasons listed in § 6662(b), including "[a]ny

---

witnesses be qualified by virtue of experience or consultation with other entities.  Experts may be qualified in various ways.  *Frazier*, 387 F.2d at 1260–61.

19

substantial valuation misstatement." 26 U.S.C. §§ 6662(a), 6662(b)(3) (2000).[21]

Section 6662(h) increases the penalty to 40% for "gross" valuation misstatements.

A substantial valuation misstatement is an overstatement of 200% or more of the

correct value or basis, and a gross valuation misstatement is an overstatement of

400% or more of the correct value or basis. *See id.* at §§ 6662(e), (h). Treasury

Regulation § 1.6662-5(g) provides:

> The value or adjusted basis claimed on a return of any
> property with a[n] . . . adjusted basis of zero is considered
> to be 400 percent or more of the correct amount. There is
> a gross valuation misstatement with respect to such
> property, therefore, and the applicable penalty rate is 40
> percent.

The IRS bears the burden of production with respect to a taxpayer's liability

for a § 6662(a) penalty and must produce sufficient evidence supporting imposition

of the penalty. *See* 26 U.S.C. § 7491(c). If the IRS meets this burden, "[t]he

taxpayer bears the burden of establishing that he acted with reasonable cause and

in good faith" in underpayment in order to avoid the imposition of misstatement

penalties described in 26 U.S.C. § 6662. *Gustashaw*, 696 F.3d at 1139 (citing 26

U.S.C. § 6664(c)(1) (2000)).

---

[21] Sections 6662 and 6664 were amended after 2000; they now (1) carry lesser percentage requirements for valuation misstatements and (2) expressly address "reasonable cause" and "economic substance." The 2000 versions of these sections apply to CIC's 2000 tax return. The applicability of any penalty attributable to an adjustment to a partnership item was determined at the partnership level in 2000. *See id.* at §§ 6221, 6226(f) (2000).

"Under the regulations, the determination of whether the taxpayer has established reasonable cause is made based on all the pertinent facts and circumstances." *Id.*; *see also* Treas. Reg. § 1.6664-4(b)(1) (describing the evaluation of reasonable cause and good faith as a finding of fact based on the totality of the circumstances). "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Treas. Reg. § 1.6664-4(b)(1). Reasonable cause and good faith may exist in cases of "first impression" when taxpayers take reasonably debatable positions on their return, *see Williams v. Comm'r*, 123 T.C. 144, 153–54 (2004), or when taxpayers take positions on initial interpretation of unclear statutory text, *see Bunney v. Comm'r*, 114 T.C. 259, 266 (2000). "A return position that is 'arguable, but fairly unlikely to prevail in court' satisfies the reasonable basis standard." *Bunney*, 114 T.C. at 266 (quoting Treas. Reg. § 1.6662-4(d)(2)).

A taxpayer may also establish reasonable cause by showing that he "reasonably relied in good faith on the advice of an independent professional, such as a tax advisor, lawyer, or accountant, as to the transaction's tax treatment." *Gustashaw*, 696 F.3d at 1139. The professional advice must: (1) rely on the law applied to all pertinent facts and circumstances; (2) not rely on another's

21

unreasonable factual or legal assumptions or unreasonable representations; and (3) be objectively reasonable. *Id.* The advice must contemplate "the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner."[22] Treas. Reg. § 1.6664-4(c)(1)(i). Reliance is not reasonable if the advisor promoted the transaction or otherwise had a conflict of interest about which the taxpayer knew or should have known. *Gustashaw*, 696 F.3d at 1139. Reliance is likewise unreasonable "when the taxpayer knew or should have known that the transaction was too good to be true in light of all the circumstances." *Id.* (internal quotation marks omitted).

The 40% gross valuation misstatement penalty applies to CIC's reported tax loss from the CARDS transaction because (1) the transaction lacked economic substance, and (2) the correct basis of CIC's redeemed note was zero, causing underpayments in CIC's partners' taxes for 2000. Treas. Reg. § 1.6662-5(g); *see also United States v. Woods*, 571 U.S. 31, 43–44, 134 S. Ct. 557, 565–66 (2013). Thus, CIC is subject to this 40% penalty unless it can show that it had reasonable cause for its underpayment and acted in good faith. CIC argues that it should not be subject to this penalty because it *did* have reasonable cause to claim the

---

[22] "[A]dvice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner." Treas. Reg. § 1.6664-4(c)(1)(ii).

$27,724,620 capital loss on its 2000 tax return, and acted in good faith. CIC claims that it had reasonable cause because (1) CIC's managers reasonably relied upon counsel of professional advisors—including advice in an opinion letter from B&W and the assurances of CIC's other advisors—regarding the tax treatment of CARDS transactions, and (2) CIC took a reasonable position in its 2000 tax return under the unclear law that existed at the time.

The Tax Court addressed CIC's argument that it had reasonably relied on the counsel of professional advisors in claiming a $27,724,620 loss, finding that CIC's reliance upon professional advice from B&W or any of its other advisors was objectively unreasonable in light of the facts. The court evaluated witness credibility and the facts in the record to conclude that CIC knew or should have known that B&W's opinion letter was not independent advice but was provided as part of Chenery's promotion of the CARDS plan, and CIC also knew or should have known that the CARDS transaction was too good to be true, regardless of what any advisors may have said.[23] The court also concluded that CIC did not

---

[23] The Tax Court noted that Chenery selected B&W to evaluate the CARDS transaction. In the initial stages of setting up the CARDS transaction, the chief CARDS promoter at Chenery, Mr. Hahn, cited as a reference Mr. Ruble, CIC's contact at B&W. Moreover, B&W's opinion letter was promised as part of the CARDS package and CIC paid B&W indirectly through Chenery, clearly indicating that B&W had a conflict of interest.

23

reasonably rely upon its local advisors at Windham or Rogers & Watkins for tax advice, because this advice was based on B&W's opinion letter.[24]

In evaluating the reasonableness of CIC's reliance and good faith with respect to the position that it took on its 2000 tax return, the Tax Court determined that CIC's managers were not as "unsophisticated" as they claimed to be. CIC argued that its managers lacked tax sophistication, but the court properly considered the "education, sophistication, and business experience" of the managers and the CIC Investment Committee more broadly.[25] *See* Treas. Reg. § 1.6664-4(b)(1). The court found relevant the CIC managers' substantial knowledge and experience with respect to loans and investment, suggesting that they were familiar with ordinary financing transactions and tax consequences. The court noted how CIC's managers had considerable experience in financing transactions but did not investigate alternative financing options despite the high cost of the CARDS transaction. Ultimately, the court concluded that CIC did not reasonably rely on professional advice in drafting its 2000 tax returns.

CIC also argued that it had reasonable cause for its underpayment in 2000 because CARDS plans were a novel legal issue at that time, and CIC took a

---

[24] CIC's advisors looked into some of the materials cited in the letter but failed to conduct any independent legal research despite the clearly apparent conflict of interest created by the evident relationship between Chenery and B&W.

[25] The Committee included an individual with an executive MBA, an individual with a business degree, and several people with investment experience. Lonnie Baxter and Henry Bird, managers of CIC and members of the Committee, both had significant experience with loans.

reasonable position given the unclear nature of the law. Although CARDS was a new tax structure in 2000, the legal theory underlying the FPAA issued to CIC was already established: transactions lacking economic substance are disregarded for tax purposes. The IRS issued Notice 2000-44 in August 2000, warning taxpayers about generating artificial losses from schemes that purported to inflate basis in assets. I.R.S. Notice 2000-44, 2000-2 C.B. 255. The IRS stressed that it would not recognize transactions lacking economic substance or business purpose for tax purposes, and taxpayers who claimed artificial tax benefits through such schemes would be subject to penalties. *Id.*

Notice 2000-44 did not explicitly address the illegality of a CARDS transaction, but described improper methods by which taxpayers attempted to inflate their adjusted basis to claim a loss in their taxes. Specifically, Notice 2000-44 stated that "a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable." *Id.* Notice 2000-44 then cited *ACM Partnership v. Commissioner*, which described "bona fide losses" and recognized the relevant "transactions whose economic substance is at issue" as the "exchange . . . which gave rise to the disputed tax consequences." 157 F.3d 231, 252, 260 (3d Cir. 1998).

25

Notice 2000-44 also cited *Scully v. United States*, 840 F.2d 478, 486 (7th Cir. 1988) (finding that deductible losses must be "genuine economic loss[es]"), and *Shoenberg v. Commissioner*, 77 F.2d 446, 448 (8th Cir. 1935), to provide guidance regarding the nature of bona fide losses with economic substance. In *Shoenberg*, the Eighth Circuit recognized that it was proper to "examin[e] all matters, relating to the sale by the taxpayer, which bear upon the deductible character of the loss shown by that sale." 77 F.2d at 448. The Eighth Circuit stated that the specific transaction to examine was "the entire transaction on account of which the deduction was claimed." *Id.* at 448–49. When CIC engaged in a CARDS transaction, it knew—based on a reading of B&W's opinion letter— that the IRS had issued Notice 2000-44. The Tax Court determined that CIC was not dealing with a novel tax law issue in 2000, and CIC should have reasonably concluded based on the existing law and language in Notice 2000-44 that its CARDS loss-generating scheme—which would allow it to overstate its adjusted basis—was a plan to "generate an artificial tax loss," and thus would be subject to penalty. I.R.S. Notice 2000-44, 2000-2 C.B. 255.

Regardless of whether a novel issue existed, the Tax Court considered all facts and circumstances in evaluating reasonability and good faith. *See* Treas. Reg. § 1.6664-4(b)(1). Here, the court considered CIC's alleged reliance on its professional advisors, the sophistication and experience of CIC's managers, and

26

the applicability of existing law in 2000 to determine that CIC lacked reasonable cause and good faith.  The court supported its findings in its opinion by including facts and credibility determinations upon which it relied.  Based on the totality of circumstances, the Tax Court chose a permissible view of the evidence and did not clearly err in finding that CIC lacked reasonable cause and good faith in underpayment.

### IV. Challenge Under 26 U.S.C. § 6751(b)(1)

Finally, CIC challenges the IRS imposition of a penalty in this case by asserting that the IRS did not comply with 26 U.S.C. § 6751(b)(1), which provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."  CIC claims that the recent resolution of *Graev v. Commissioner*, 149 T.C. No. 23 (2017), provided new grounds for challenging the Tax Court's imposition of penalties in the present case under § 6751(b)(1).  CIC has waived this challenge, and we decline to consider it now.

Appellate courts have discretion to decide whether to consider a legal issue or theory raised for the first time on appeal.  *United States v. S. Fabricating Co.*, 764 F.2d 780, 781–82 (11th Cir. 1985) (per curiam).  Parties cannot raise new issues at supplemental briefing, even if the issues arise based on intervening

27

decisions or new developments. *See United States v. Nealy*, 232 F.3d 825, 830 (11th Cir. 2000); *see also McGinnis v. Ingram Equip. Co., Inc.*, 918 F.2d 1491, 1495–96 (11th Cir. 1990) (noting that waiver usually bars "new arguments and issues not presented until a late stage of the proceedings," but not "new law that could be applied to arguments already developed").

CIC could have brought a challenge under § 6751(b)(1) during or after Tax Court proceedings prior to appeal, as other taxpayers have done. *See, e.g.*, *Chai v. Comm'r*, 851 F.3d 190, 203 (2d Cir. 2017). CIC failed to do so, instead raising the issue for the first time in supplemental appellate briefing. We decline to consider this non-jurisdictional challenge for the first time now. *Accord Mellow Partners v. Comm'r*, 890 F.3d 1070, 1080–82 (D.C. Cir. 2018) (refusing to consider a § 6751 challenge brought for the first time on appeal in similar circumstances); *cf. Chai*, 851 F.3d at 223 (holding that a taxpayer properly raised a challenge under § 6751 in a post-trial brief to the Tax Court, thus preserving the issue for appeal).

## V. Conclusion

The Tax Court did not err in concluding that CIC's CARDS transaction lacked economic substance or business purpose, nor in finding that CIC was liable for a 40% gross valuation misstatement penalty for its 2000 tax return. Finally, the Tax Court did not clearly err in determining that CIC lacked reasonable cause and

good faith in making an understatement on its 2000 tax return.  Accordingly, we affirm.

**AFFIRMED**.